# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

STEYR ARMS, INC.,

        Plaintiff,

    v.

SIG SAUER, INC.,

        Defendant.

:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:17-cv-00483-JD

---

## PLAINTIFF STEYR ARMS, INC.'s SPR 6.1(e)(2)
## RESPONSIVE CLAIM CONSTRUCTION BRIEF

---

# **TABLE OF CONTENTS**

I.     RESPONSE TO SIG SAUER'S "BACKGROUND" ........................................ 1

     A.    U.S. Patent No. 6,260,301 ................................................................. 1

     B.    The Accused SIG Sauer Pistols ........................................................ 2

     C.    The Kel-Tec P-11 Publication .......................................................... 3

II.    ANALYSIS OF DISPUTED CLAIM TERMS ........................................... 5

     A.    "A Multifunction Metal Part Removably Insertable Within Said Housing" .......... 5

     B.    "Means for Supporting the Trigger Mechanism" ................................... 10

     C.    "Said Multifunction Metal Part and Housing are Each Provided With a Transverse Hole Which Receives a Shaft for Connecting the Housing and the Multifunction Metal Part Together" ........................................ 12

     D.    "The Housing Has a Rear Wall Which is Provided with a Recess for Receiving a Projection on the Multifunction Metal Part" .................... 14

     E.    "The Multifunction Metal Part Includes Control Means for Locking Said Barrel in the Barrel Slide" .................................................. 15

          1.    There is no Prosecution History Estoppel ................................ 16

               a.    Defendant Applies the Incorrect Legal Standard to § 112 Literal Equivalents ............................................. 16

               b.    Steyr Did Not Disclaim Any Claim Scope ................................. 17

               c.    Foreign Proceedings Are Extrinsic Evidence and Steyr Made No Disclaimer of Claim Scope ....................................... 18

          2.    The Function Of Locking The Barrel  In The Barrel Slide Is Not Indefinite ................................................................ 20

III.   CONCLUSION ................................................................................. 20

# **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*3M Innovative Props. Co. v. Tredegar Corp.*
   725 F.3d 1315 (Fed. Cir. 2013) .......................................................................... 17

*AIA Engineering, Ltd V. Magotteaux Intern. S/A*
   657 F.3d 1264 (Fed. Cir. 2011) .......................................................................... 18

*Baldwin Graphic Sys.v. Siebert, Inc.*
   512 F.3d 1338 (Fed. Cir. 2008) ............................................................................ 6

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*
   2001 U.S. LEXIS 11835, at *19-20 (S.D.Ind. 2001) ........................................... 17

*Carotek, Inc. v. Kobayashi Ventures, LLC*
   No. 07-civ-11163-NRB, 2011 U.S. Dist. LEXIS 102014, at *49
   (S.D.N.Y. Sept. 8, 2011) .................................................................................... 12

*Edwards Life Sciences LLC v. Cook Inc.*
   582 F.3d 1322 (Fed. Cir. 2009) ............................................................................ 9

*Electro Med. Sys. S.A. v. Cooper Life Sci.*
   34 F.3d 1048 (Fed. Cir. 1994) .............................................................................. 6

*Engineered Prods. Co v. Donaldson Co.*
   313 F. Supp. 2d 951 (N.D. Iowa 2004) ............................................................... 17

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*
   535 U.S. 722 (2002) ..................................................................................... 16, 17

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*
   93 F.3d 766 (Fed. Cir. 1996) .............................................................................. 10

*Info-Hold, Inc. v. Applied Media Techs., Corp.*
   783 F.3d 1262 (Fed. Cir. 2015) ............................................................................ 6

*Int'l Visual Corp. v. Crown Metal Mfg. Co.*
   991 F.2d 768 (Fed. Cir. 1993) .............................................................................. 1

*Mars, Inc. v. H. J. Heinz Co., L.P.*
   377 F.3d 1369 (Fed. Cir. 2004) .......................................................................... 16

*Merck & Co. v. Teva Pharm. USA, Inc.*
  395 F.3d 1364 (Fed. Cir. 2005)............................................................................ 9, 10

*Phillips v. AWM Corp.*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................. 6, 8, 14, 15

*Retractable Techs., Inc. v. Becton Dickinson & Co.*
  563 F.3d 1296 (Fed. Cir. 2011)................................................................................ 9

*Symbol Technologies, Inc. v. Optimum, Inc.*
  935 F.2d 1569 (Fed. Cir. 1991)............................................................................... 11

*Teleflex, Inc. v. Ficosa North America Corp.*
  299 F.3d 1313 (Fed. Cir. 2002)................................................................................ 6

*TM Patents L.L.P. v. IBM*
  136 F. Supp. 2d 209 (S.D.N.Y. 2001)..................................................................... 17

*Unwired Planet, LLC v. Apple, Inc.*
  829 F.3d 1353 (Fed. Cir. 2016)............................................................................... 17

*Whats App Inc.v. Intercarrier Communs., LLC*
  No. 13-cv-04272-JST, 2014 U.S. Dist. LEXIS 148063, at *29
  (N.D. Cal. Oct. 16, 2014)....................................................................................... 11

## I.      RESPONSE TO SIG SAUER'S "BACKGROUND"

### A.      U.S. Patent No. 6,260,301

Defendant mischaracterizes the invention in U.S. Patent No. 6,260,301 (the `301 Patent). As noted in Steyr Arms, Inc.'s (hereinafter "Steyr") Opening Claim Construction Brief at pages 1-2, the invention is directed to a pistol having a novel combination of parts.  The pistol includes a plastic housing and a multifunction metal part removably inserted into the plastic housing.  A unique aspect of the `301 Patent is the way in which the multifunction metal part is held within the housing.  Specifically, the disassembly lever shaft is inserted through holes in the multifunction metal part and holes in side parts of the plastic housing and, in combination with a projection at the rear of the multifunction part which engages in the housing rear wall recess, firmly holds the multifunction metal part in the housing.  The multifunction metal part is inserted and removed from the hosing as a complete assembly.  *See* Col. 2, lines 37-50.  The disassembly lever shaft thus provides the dual function of releasing the barrel slide for withdrawal and disassembly as well as providing the connection for holding the multifunction metal part within the plastic housing.

As described in the specification and set forth in Claim 1, in the case of a pistol having a barrel which can be locked in the barrel slide, the multifunction metal part also includes control means to perform this function.  As shown in Figs. 1, 5 and 6, the control means is a second bridge 33 provided on the multifunction metal part.

In its discussion of the invention in the `301 Patent, Defendant makes reference to Steyr's commercially available pistols covered by the `301 Patent.  However, these pistols have no relevance when construing the claim.  *See, Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771-772 (Fed. Cir. 1993).

### B. The Accused SIG Sauer Pistols

Steyr alleges that SIG Sauer's P250 and P320 pistols infringe the `301 Patent. The illustrations from p. 3 of SIG Sauer's Opening Claim Construction Brief are reproduced below:



**P250 "7 Frame"**  **P320 "Frame Assembly"**

As set forth in Carroll Decl. Exh. D, Steyr's Preliminary Infringement Contentions and as can be seen from the illustrations above, both the P250 and P320 use the same structure described above with respect to the `301 Patent to hold the frame, *i.e.*, multifunction metal part, in the housing. Specifically, the P250 and P320 include a projection ("green") at the bottom rear end of the frame which is received in a recess in the rear wall of the plastic housing. *See e.g.*, Carroll Decl. Exh. D, p. 20 of 29. Furthermore, the P250 and P320 frames include holes therethrough which align with holes in the plastic housing to receive a takedown lever ("red", reference no. 5 in P250, component part above "Step 3" in P320), *i.e.*, disassembly lever shaft, to hold the frame in the housing.

Likewise, with respect to locking the barrel in the barrel slide, the P250 and P320 include a bridge which spans the frame in the form of a slide catch lever pin 10 ("blue") in the P250 illustration and the pin shown above the trigger in the P320 illustration.

2

### C.       The Kel-Tec P-11 Publication

The Defendant's assertions regarding the Kel-Tec P-11 Publication are erroneous and misleading.  This Publication, Carroll Decl. Exhibit C, was first brought to the attention of Steyr's Austrian affiliate in a European Patent Office ("EPO") opposition proceeding filed in 2004 with respect to a European Patent corresponding to the `301 Patent.  Steyr's Austrian affiliate subsequently filed an infringement suit against SIG Sauer's related German entity, J.P. Sauer & Sohn GmbH, for infringement of the German part of European Patent EP 0 979 986 B1 (EP `986 Patent) and of the German utility model DE 299 24 790 U1 ("DE `790").  In response to the infringement action, J.P. Sauer & Sohn filed a Cancellation Petition against DE `790.  DE `790 was filed with three claims clearly distinguishing over the Kel-Tec Publication, and corresponding to the three amended claims of EP `986 B2.  In the opposition proceeding, the EPO held that the three amended claims of EP `986 B2 were valid over the Kel-Tec Publication and therefore enforceable.  After the EPO decision in favor of Steyr, J.P. Sauer & Sohn withdrew the German Cancellation Petition and settled the infringement suit.

Footnote 3, p. 2 of SIG Sauer's Opening Brief states "Steyr did not tell the United States Patent Office about this prior art pistol during prosecution of the `301 Patent."  While this statement is correct, it is extremely misleading and without meaning.  The prosecution of the `301 Patent terminated when the patent issued on July 17, 2001.  Steyr did not become aware of the Kel-Tec Publication until the filing of the EPO opposition proceeding in 2004.  Thus, Steyr could not have disclosed the publication to the U.S. Patent Office during prosecution.

As was determined by the EPO in the opposition proceeding, the invention of the `301 Patent is related to the ease of assembly and disassembly and was held to be patentably distinguishable from the Kel-Tec Publication.  In the `301 Patent, Steyr designed for the first time a pistol in which the disassembly lever shaft provided a connection between the

3

multifunction metal part and plastic housing by extending through transverse holes therein. Thus, in combination with the projection on the rear of the multifunction metal part engaging in a recess in a rear wall of the housing, there was no need for separate mounting structures such as the three pins 202 ("yellow") on the Kel-Tec P11 as shown below.



*See* Carroll Decl. Exh. C, Production No. SA000815.

Also, as shown above, the assembly pin 110 ("red"), which structurally corresponds to the `301 Patent disassembly lever shaft, does not provide any connection of the frame 210 to the housing 300 since assembly pin 110 does <u>not</u> pass through any hole in the housing 300. Furthermore, the rear wall of the housing 300 includes a cut out into which the rear of the frame 210 resides, but does <u>not</u> connect the frame to the housing. Thus, the Kel-Tec publication fails to disclose a projection on the rear of the multifunction metal part which engages in a recess in the rear wall of the housing for holding, together with the disassembly lever shaft, the multifunction metal part in the housing as defined by the claim in the `301 Patent. Defendant improperly refers to the cut out in the rear wall of the Kel-Tec housing as a "recess." Specifically, SIG Sauer at p.

3 of its Opening Brief refers to this structure as "a rear-facing protrusion that engages a corresponding recess in the grip to help secure the frame in place."  However, the cut out in the grip housing 300 does <u>not</u> engage or hold the frame to the housing.  In fact, the rear facing protrusion and rear housing include a transverse hole to receive one of the pins 202 (yellow) to hold the frame in the housing, *i.e.*, a completely different structure from the claimed invention.

With respect to the control means for locking the barrel in the barrel slide as set forth in the claim of the `301 Patent, the multifunction metal part is provided with a bridge 33 which spans the sides of the multifunction metal part as shown in Figs. 1, 5 and 6 to control the barrel from moving past a certain point when fired.  The Kel-Tec Publication discloses to one of ordinary skill in the art that the assembly pin 110 is used for two purposes.  The first is to enable a disassembly (pulling off) of the barrel slide (with the barrel) from the guides.  The second purpose is to function as the "control means" for locking the barrel in the barrel slide during firing.  For the first function, the assembly pin 110 needs to be removed to disassemble the barrel and barrel slide from the frame.  However, this does not release the frame from the housing, as the frame is held by the three pins 202 (yellow).  When the barrel slide with the barrel is re-installed, the assembly pin 110 is re-inserted and provides the second function of a bridge to control the movement of the barrel during firing.

## II.    ANALYSIS OF DISPUTED CLAIM TERMS

### A.    "A Multifunction Metal Part Removably Insertable Within Said Housing"

- Steyr's Proposed Construction

    A metal multifunction part removably insertable into the housing as a single part rather than individual component parts, the multifunction metal part including a projection, guides for the barrel slide, means for supporting the trigger mechanism, a transverse hole to receive the shaft for connecting the housing and the multifunction metal part together and control means for locking the barrel in the barrel slide.

5

- SIG Sauer's Proposed Construction
  A one-piece metal frame that serves multiple functions.

The main difference between the proposed constructions is that Defendant improperly requests that the multifunction metal part be construed as "one-piece," adding a limitation to the claim which is not in the claim itself.  Furthermore, the term "one-piece" is not used at all in the `301 Patent specification.  Thus, Defendant seeks to have the Court commit one of the "cardinal sins of patent law [by] reading a limitation from the written description into the claims." *Phillips v. AWM Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (en banc).  Although the specification is used to interpret a claim, it cannot be used to add extraneous limitations into a claim.  *Baldwin Graphic Sys., v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008).  Furthermore, the Federal Circuit has "repeatedly warned" against confining claims of a patent to the specific embodiments described in the specification.  *Phillips*, 415 F.3d at 1323.  *See also Electro Med. Sys. S.A. v. Cooper Life Sci.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("[P]articular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments.")  In fact, the Federal Circuit has expressly rejected the contention that if a patent describes only a single embodiment, the claim of the patent must be construed as being limited to that embodiment.  *See Phillips*, 415 F.3d at 1323; *Info-Hold, Inc. v. Applied Media Techs., Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015).  Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).

Defendant cites to the `301 Patent "Summary of the Invention" section which, in turn, refers to a previously stated object of the invention.  Based upon the shortcomings of the prior art

6

design described in the Background (Col. 1, Lines 11-39), the `301 Patent states that, "It is an object of the present invention to provide a pistol construction which allows for the use of plastics technology to a large extent, and which provides high precision and simple assembly." In the Summary of the Invention, the `301 Patent states:

> According to the invention, the foregoing object is achieved wherein a single, metal, multifunction part is removably inserted into the housing, and on the multifunction part the guides for the barrel slide are formed, and the elements of the trigger mechanism are mounted and guided.
> The multifunction part can easily be manufactured and processed with high precision, is fitted with all the moving parts, and is not inserted into the housing until after the fitting has been done.  It can be removed again for repair purposes.  All parts are easily accessible during assembly and repair.

`301 Patent, Col. 1, Lines 47-61.

Based upon the use of the word "single," Defendant makes the leap to equating "single" with "one-piece."  To the contrary, the `301 Patent refers to the "single, multifunction metal part" in contrast to the prior art which required multiple individual parts to accomplish the functions of the multifunction metal part.  *See* `301 Patent, Col. 1, Lines 24-39.  ". . . A further disadvantage [of the prior art GLOCK Model 17 pistol] is that the individual parts are difficult to fit into the housing."  Moreover, the `301 Patent specification also discloses that the multifunction metal part can be produced in various ways.  *See* `301 Patent, Col. 3, Lines 17-20.  Thus, it is clear from the specification that the multifunction metal part is not required to be "one-piece."

In the Memorandum Opinion and Claim Construction Order, attached as Exhibit B to Steyr's Opening Claim Construction Brief, the Court rejected Baretta's similar argument that the control, or second bridge must be part of a unitary multifunction metal part formed as one piece. The Court held that based on the language above at Col. 3, Lines 17-20,

> "the specification contemplates that the second bridge may be a
> <u>separate</u> piece that is formed on the multifunction metal part by welding

the pieces together, the specification does <u>not</u> state that the multifunction metal part and second bridge must be a unitary piece formed from a <u>single piece</u> of metal."

Exhibit B, Claim Construction Order, pp. 27-28 (emphasis added).

As stated above, neither the claims nor the specification ever use the terms "one-piece" or "unitary" when describing the multifunction metal part. To add such a narrowing limitation to the claim construction would be clear error in view of controlling Federal Circuit precedent.

Defendant suggests that Steyr's proposed construction is flawed and is likely to confuse a jury. To the contrary, Steyr's proposed claim construction closely follows Federal Circuit precedent and includes a recitation of the functions and structure as specifically set forth in Claim 1. In essence, Steyr's proposal is "a metal multifunction part removably insertable into the housing as a single part rather than individual component parts."

The multifunction metal part in Claim 1 of the `301 Patent overcomes the disadvantages of the prior art by being manufactured with high precision and fitted with all the moving parts, and not inserted into the housing until after the fitting has been done to form a complete unit. *See* `301 Patent, Col. 1, Lines 47-57; Col. 2, Lines 59-64. Accordingly, Steyr's proposed claim construction is based on the claim language itself and should be adopted. *See Phillips*, 415 F.3d at 1314, "the claims themselves provide substantial guidance as to the meaning of particular claim terms."

Defendant also suggests that to the extent Steyr's proposed construction could be interpreted to cover a frame assembly comprised of multiple removable parts, would be to expand the claim scope beyond anything described in the specification. However, that is exactly what is described in the specification. The multifunction metal part provides the support for the trigger mechanism, *i.e.*, a plurality of trigger components mounted on removable pins inserted

8

into holes provided in the multifunction metal part.  As discussed above, only when the assembly of the multifunction metal part is complete, the completed unit is then inserted into the housing.

Defendant's assertion that the use of the term "invention" in the specification limits the multifunction metal part to being one-piece is legally and factually wrong.  The Summary of the Invention discloses a "single, multifunction metal part;" not one-piece.  Col. 1, lines 46-51.  The case law relied upon by the Defendant is highly fact dependent and entirely distinguishable from the present case.  In *Retractable Techs., Inc. v. Becton Dickinson & Co.,* 563 F.3d 1296, 1304-05 (Fed. Cir. 2011), the specification repeatedly referred to the syringe body as one-piece.  A one-piece body construction was also used to distinguish over the prior art which had multi-part bodies.  In the present case, a one-piece design was never asserted in the prosecution history in order to distinguish over prior art.  In *Edwards Life Sciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009), the Court found it significant that the specification consistently used the term "graft" and "intraluminal graft" interchangeably and frequently described the intraluminal graft as "the invention".  Furthermore, the claims themselves were found to have language that required the graft to be intraluminal.  The `301 patent has none of these conditions.  To the contrary, the `301 specification never refers to the multifunction metal part as "one-piece" and in fact states the opposite.  `301 Patent, Col 3, lines 17-20.  The `301 Patent specification also states, that "[t]he description of an exemplary embodiment is not intended to limit the invention in any way to a specific method of construction or method of operation of a pistol."  Col. 3, line 21 - Col. 4, line 1.  Thus, the disclosed embodiments are explicitly stated to be exemplary.

Lastly, Defendant argues that Steyr's proposed construction is improper as being redundant, citing to *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). However, the cited case does not support such a statement and, in fact, does not use the

word "redundant."  To the contrary, the Court held that their construction of the claim term "about" eliminated the problem pointed out by *Teva* that the district court's construction of the term "about" renders other parts of the claim superfluous.  *Id.*  The case also cited to *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting the district court's claim construction because it rendered superfluous the claim requirement for openings adjacent to the end walls).  Steyr's proposed claim construction does not render any claim limitations superfluous or unnecessary and is therefore proper since all the limitations of the claim are construed to be necessary and a part of the construction.

**B.**      **"Means for Supporting the Trigger Mechanism"**

- Steyr's Proposal

    A multifunction metal part including any desired holes and pins mounted therein such that the trigger and trigger parts are all mounted on the multifunction metal part, and equivalents thereof.

    The function is to "support" or mount the trigger mechanism.  Referring to the specification and drawings, the structure identified to support the trigger mechanism is the multifunction metal part including holes and pins mounted therein.

- SIG Sauer's Proposal

    Means-plus-function limitation:
    (1) means:  a hole or other type of recess;
    (2) function:  for supporting the trigger mechanism – capable of securing at least one trigger component by receiving an insert.

Defendant's proposed construction fails to properly follow the law of claim construction with respect to "means plus function" limitations.  The function is clearly to support the trigger mechanism.  Defendant proposes that the function is "capable of securing at least one trigger component by receiving an insert."  Defendant uses terms not found anywhere in the claim or patent specification such as "securing" and "insert."  In fact, the term "insert" does nothing but make the construction unclear as to what is meant by an insert.

Defendant's construction also runs afoul in identifying the structure from the specification that performs the function.  Defendant proposes that the structure is "a hole or other type of recess."  A hole cannot perform the function of supporting the trigger mechanism.  It is the combination of a multifunction metal part including holes and pins mounted therein that support the components of the trigger mechanism as set forth in Steyr's proposed construction.  *See* `301 Patent, Col. 2, lines 52-64.

Defendant suggests that Steyr's proposed construction is improper because it does not define what constitutes an "equivalent" and "instead seeks to leave it to the jury to perform such claim construction."  This statement is fundamentally wrong.  First, a proper construction of a means plus function limitation entitles the patentee <u>by statute</u> to cover the corresponding structure described in the specification "and equivalents thereof" to perform the specified function. Thus, by statute the construction must include "equivalents."  Secondly, the determination of what constitutes "equivalents thereof" is to be performed during the infringement determination which is a question of fact.  *See Symbol Technologies, Inc. v. Optimum, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991) ("The scope of literally infringing 'equivalents' under § 112 ¶ 6 is a factual determination.") (citation omitted).  Thus, Defendant provides no authority to support the assertion that the Court needs to determine literal equivalents as part of claim construction.  *See, Whats App Inc.v. Intercarrier Communs., LLC*, No. 13-cv-04272-JST, 2014 U.S. Dist. LEXIS 148063, at *29 (N.D. Cal. Oct. 16, 2014) ("Whats App offers no reason why the statutory language "and equivalents thereof" should not be included in the construction of this term.").  Furthermore, the Alabama Court in its decision on claim construction of this same limitation included the statutory language.  *See* Steyr Opening Brief, Exhibit B, pp. 23 and 29.  The cases cited by Defendant on this issue do not support their

11

position.  In fact, one specifically notes that the determination of equivalent structures is reserved

for the infringement analysis.  *Carotek, Inc. v. Kobayashi Ventures, LLC*, No. 07-civ-11163-

NRB, 2011 U.S. Dist. LEXIS 102014, at *49 (S.D.N.Y. Sept. 8, 2011) ("[w]e agree with

Kobayashi that the identification of equivalent structures is an analytical step that is distinct from

the identification of structure in the specification and is more appropriately reserved for an

infringement analysis.").  Accordingly, it would be error for the Court to determine literal

equivalents under § 112, ¶ 6 during claim construction.  It is proper to include "and equivalents

thereof" as provided by statute in the Court's claim construction.  Furthermore, Defendant at the

top of page 21 of their opening brief, admits that a proper construction includes equivalents.

Thus, Steyr's proposed claim construction is supported by the law and the specification and

should be adopted by the Court.

> ### C.   "Said Multifunction Metal Part and Housing are Each Provided With a Transverse Hole Which Receives a Shaft for Connecting the Housing and the Multifunction Metal Part Together"

- Steyr's Proposal

  A housing and multifunction metal part including aligned transverse holes
  dimensioned to receive a disassembly lever shaft, the disassembly lever
  shaft received in the transverse holes and the projection received in the
  housing recess together hold the multifunction metal part firmly in the
  housing.

- SIG Sauer's Proposal

  A hole, located on the left or right side of the housing, configured to
  receive a rod-shaped object in order to connect the housing to the
  multifunction metal part.

Defendant's proposed construction is improper for several basic reasons.  First, Defendant

proposes that the "transverse hole" is "a hole located on the left or right side of the housing."

Such a proposal is unsupported by the claim language as well as the specification.  The claim

requires that the multifunction metal part and housing <u>are each</u> provided with a transverse hole

12

which receives a shaft for connecting the parts together.  As shown in the figures and described in the specification, "a disassembly lever shaft 14 (Fig. 3) is inserted into holes 15 in the multifunction part 10 and into holes 16 in the side parts of the plastic housing 1."  `301 Patent, Col. 2, Lines 43-45.  Accordingly, the specification and figures describe and illustrate aligned holes in each of the multifunction metal part and housing which are transverse, *i.e.*, lying or extending across, side to side (the common definition for the term "transverse") to receive the disassembly lever shaft.  Thus, Defendant's proposed construction of a single hole in the housing, which is not transverse or extending across both the housing and multifunction metal part, is incorrect in view of the common understanding of the claim language itself and further in view of `301 Patent specification and figures

With respect to the term "shaft," it is curious that Defendant now seeks a broad construction of this term in view of their contrary position with respect to the multifunction metal part.  With respect to the multifunction metal part, Defendant strenuously argues to improperly add the "one-piece" limitation even though that term appears nowhere in the claim, patent specification or prosecution history in an attempt to potentially avoid infringement.  In this instance, the only "shaft" disclosed in the `301 Patent is the disassembly lever shaft.  In fact, the term "shaft" is not used alone anywhere in the specification but in each instance is referred to as the disassembly lever shaft.  Furthermore, the claim language itself defines "a shaft for connecting the housing and multifunction metal part together."  The `301 Patent specifically states in several passages that this connection is made by the disassembly lever shaft.  *See* `301 Patent, Col. 2, Lines 43-47 ("a disassembly lever shaft 14 (Fig. 3) is inserted into holes 15 in the multifunction part 10 and into holes 16 in the side parts of the plastic housing 1.  The projections 11 and the disassembly lever shaft 14 hold the multifunction part firmly in the housing.").  *See*

*also* `301 Patent, Col. 1, Lines 62-67.  While Steyr argues that it is improper to import limitations from the specification into the claims, "the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."  *Phillips*, 415 F.3d 1320, 1323.  With respect to the shaft for connecting the housing and multifunction metal part, the specification only identifies the disassembly lever shaft to accomplish this function.  Thus, one of ordinary skill in the art would understand that, based upon the disclosure in the specification, the "shaft for connecting the housing and the multifunction metal part together" is the disassembly lever shaft, not just any "rod-shaped object" as proposed by Defendant.  Furthermore, the term "rod-shaped" is not used anywhere in the `301 Patent.  Accordingly, Steyr's proposed claim construction is fully supported by the specification and the language of the claim itself and should be adopted by the Court.

     **D.**    **"The Housing Has a Rear Wall Which is Provided with a Recess for Receiving a Projection on the Multifunction Metal Part"**

- Steyr's Proposal

   The multifunction metal part is provided with a projection which engages in a recess in the rear wall of the housing for the purpose of removably inserting the multifunction metal part into the housing, the disassembly lever shaft received in the transverse holes and the projection received in the housing recess together hold the multifunction metal part firmly in the housing.

- SIG Sauer's Proposal

   The backmost wall of the housing which contains a hollow area, formed by an indent, hole, or cut-out, which hollow area is configured to receive an insert.

Steyr's proposed construction relies on the ordinary and customary meaning of the commonly understood claim terms "projection" and "recess."  The Federal Circuit has held on numerous occasions that claim construction involves "little more than the application of the

widely accepted meaning of commonly understood claim terms." *Phillips*, 516 F.3d at 1314.

That is precisely the case in this instance.  To the contrary, Defendant proposes changing

perfectly understandable claim terms to use more words not found anywhere in the claim or

patent specification.  Specifically, instead of the term "recess," Defendant proposes that the rear

wall of the housing "contains a hollow area, formed by an indent, hole or cut out."  Defendant

provides no legal basis to support such a construction.  There is no reason to replace the

limitation of a recess with other terminology not used anywhere in the `301 Patent.  Furthermore,

to change the word "projection" to an "insert" does nothing but confuse the scope of the claim

since, once again, the term "insert" is not used anywhere in the specification.

> ### E.    "The Multifunction Metal Part Includes Control Means for Locking Said Barrel in the Barrel Slide"

- Steyr's Proposal

  A bridge which spans the sides of the multifunction metal part, and equivalents thereof.

  With respect to the limitation "control means for locking said barrel in the barrel slide" the function is to lock the barrel shown in Fig. 1 as reference numeral 3 in the barrel slide, reference numeral 2.  Referring to the specification and drawings, the structure identified to lock the barrel in the barrel slide is a bridge 33 provided on the multifunction metal part.

- SIG Sauer's Proposal

  Means-plus-function limitation:
  (1) means: "control means" – a bridge-like portion of the multifunction metal part designed to engage a portion of a barrel;
  (2) function: "locking said barrel in the barrel slide" – indefinite.

The parties agree that the structure disclosed in the specification to accomplish the

function of locking the barrel in the barrel slide is the second bridge 33.  Thus, the structure

should be construed as a bridge which spans the sides of the multifunction metal part and

equivalents thereof which is clearly supported by the law and facts.

Defendant seeks to have the Court hold that the bridge must be a permanent, unitary part of the multifunction metal part, although such language does not appear in Defendant's proposed claim construction.  As discussed at length above, it would be improper to read into the claim the completely unsupported "one-piece" limitation suggested by Defendant.  Furthermore, the claim language itself is open ended with respect to the control means.  The claim states, "the multifunction metal part <u>includes</u> control means . . ."  With respect to claim language, the term "includes" is open-ended much like the term "comprises" and does not limit the control means to being a unitary, permanent part of the multifunction metal part.  *See Mars, Inc. v. H. J. Heinz Co., L.P.*, 377 F.3d 1369, 1375-76 (Fed. Cir. 2004).  Defendant is merely trying to avoid infringement since the control means in the accused products is a pin mounted on the multifunction metal part.  While the control means pin on the accused products may be removed from the frame for disassembly of the pistol, the pin is assembled onto the metal frame before the frame is inserted into the housing as a complete unit, just as described in the specification and set forth in the asserted claim.  Thus, the control means pin in the accused products is not removable once the metal frame is inserted into the housing.

1.       There is no Prosecution History Estoppel

a.       Defendant Applies the Incorrect Legal
Standard to § 112 Literal Equivalents

Defendant misleads the Court by frivolously asserting prosecution history estoppel under the Supreme Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,535 U.S. 722 (2002).  *Festo* addressed the doctrine of equivalents and estoppel created during prosecution. *Festo Corp.*, 535 U.S. at 726.  ("This case requires us to address once again the relation between two patent law concepts, the doctrine of equivalents and the rule of prosecution history estoppel.")  The Court did not address <u>statutory</u> literal equivalents under §112, paragraph 6.  The

16

law is explicitly clear that the test for prosecution history estoppel in *Festo* does <u>not</u> apply to <u>statutory</u> equivalents under §112.  *See Engineered Prods. Co v. Donaldson Co*., 313 F. Supp. 2d 951, 981-82 (N.D. Iowa 2004) ("Consequently, *Festo* - which explains how prosecution history estoppel affects infringement under the doctrine of equivalents - does not, and does not purport to, address either construction or literal infringement of a means-plus-function claim."); *See also Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*., 2001 U.S. LEXIS 11835, at *19-20 (S.D.Ind. 2001); *TM Patents L.L.P. v. IBM*, 136 F. Supp. 2d 209, 222 (S.D.N.Y. 2001).  Accordingly, Defendant's assertions that prosecution history estoppel applies to the control means limitation is contrary to well established precedent and simply wrong.

b.      Steyr Did Not Disclaim Any Claim Scope

In order for the scope of the claim to be limited by disclaimer, the "disclaimer or disavowal of claim scope must be clear and unmistakable . . ."  *Unwired Planet, LLC v. Apple, Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) (citation omitted).  Furthermore, just by amending a claim during prosecution does not rise to the level to create a disclaimer.  *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325-26 (Fed. Cir. 2013) (finding that an amendment made to narrow a claim during prosecution was not a disclaimer of claim scope and noting that, "in order for prosecution disclaimer to attach, the disavowal must be clear and unmistakable.").  *See also,* Steyr Opening Claim Construction Brief, Exhibit B, p. 16.  Defendant merely points to amendments during prosecution which added already existing claims, *i.e.*, dependent claims into independent Claim 1.  Such an amendment without more, clearly is not a clear and unmistakable surrender of claim scope.  Since Defendant's entire section regarding prosecution history estoppel is based upon the incorrect application of the law, their arguments are meritless.

c.      Foreign Proceedings Are Extrinsic Evidence
and Steyr Made No Disclaimer of Claim Scope

Defendant attempts to rely on arguments made by Steyr in the Cancellation Proceeding

concerning DE `790.  It is highly relevant that Claim 3 in DE `790 is not identical to the claim in

the `301 Patent and, for that matter, not the same as any limitation in the claim of the `301

Patent.  Furthermore, the standards applied to determine whether the claims in a German

Cancellation Proceeding are valid are different from the legal standard with respect to validity in

the United States.  The Federal Circuit has noted that "the theories and laws of patentability vary

from country to country as do examination practices."  *AIA Engineering, Ltd V. Magotteaux*

*Intern. S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011) (citation omitted).  For this reason, the Court

has noted "that the varying legal and procedural requirements for obtaining patent protection in

foreign countries might render consideration of certain types of representations inappropriate for

consideration in a claim construction analysis of a United States counterpart".  *Id.* (citation

omitted).  Accordingly, the arguments presented by Defendant are not relevant since the claim

itself was different and German laws regarding validity of claims in a Cancellation Proceeding

are different.  Thus, no disclaimer, if one actually existed, which it does not, can carry over to the

claim construction in the `301 Patent.

Notwithstanding the above, Defendant completely misinterprets the content and context

of the alleged argument with respect to dependent Claim 3 in DE `790.  The entire response to

the German Cancellation Petition should be considered in which there are many reasons

provided why the Petition should be denied.  *See* Carol Decl., Ex. K, SIG002807-812.  The

translated paragraph upon which Defendant relies is set forth below in its entirety:

> The Petition is of the opinion that the subject-matter of claim 3 is known
> from D1, D2 and D3, in that the Kel-Tec P11, in the barrel block of the
> barrel located there, has a control groove for controlling the locking,
> which interacts with a cross pin (assembly pin 110) arranged in the

> aluminum block (frame 210) in order to control the locking during the movement of the slide (slide 152). The petitioner, however, neglects that with regard to the "assembly pin 110," it is precisely the disassembly lever shaft according to the invention, which is not part of the multifunctional part, but merely serves to assemble it, that is concerned. That is also why, the subject matter of claim 3 is novel and based on an inventive step.

Carol Decl., Ex. K, SIG002812

When read in the context of the entire response, Steyr's German counsel was arguing that the Kel-Tec assembly pin 110, which provides the control means for locking the barrel, is not part of the metal frame 210 when the frame is inserted into the housing because the assembly pin 110 also provides the function of the disassembly lever shaft. In this very function, the assembly pin 110 is of course not a part of the multifunction metal part as it is only inserted into the Kel-Tec frame 210 <u>after</u> the frame had been inserted into the housing. This does not, however, say that a control means as such would be a part of the multifunction metal part or not. Steyr's German counsel did not make any clear and unmistakable disclaimer as to the scope of the German Claim 3 and merely argued differences between the prior art and the German claim. Lastly, if the disclaimer of claim scope was clear and unmistakable, Defendant surely would not have withdrawn the Cancellation Petition and settled the litigation in Germany.

Contrary to Defendant's argument with respect to the Kel-Tec Publication, the accused SIG Sauer pistols use as control means a pin assembled onto the frame <u>prior</u> to the frame being removably inserted into the housing. Thus, the control means for locking the barrel on the accused products is provided on the multifunction metal part as part of the complete unit including the trigger components prior to insertion into the housing. Thereafter, the takedown lever, *i.e.* disassembly lever shaft, is inserted to hold the metal frame in the housing.

2.      The Function Of Locking The Barrel
In The Barrel Slide Is Not Indefinite

During the prosecution of the `301 Patent, the Examiner objected to original dependent

Claim 4 which included the locking function as being indefinite for not identifying what portion

or part of the multifunction metal part is intended to correspond the "means for locking a barrel

in the barrel slide." *See* Steyr Opening Claim Construction Brief, Exhibit C, SA000038-39.  To

the satisfaction of the Examiner, Steyr's counsel amended Claim 4 to clarify that the means was

the "control means."  *See* Steyr's Opening Claim Construction Brief, Ex. C, SA000078 and

SA000080.  Based upon this amendment, the Examiner withdrew the indefiniteness rejection.

The Examiner as well as those skilled in the art at the time of the invention, clearly understood

the structure to accomplish the function of locking the barrel in the barrel slide.  In fact,

Defendant discusses this function at length with respect to the Kel-Tec Publication.  Thus, this

argument is clearly without merit.

## III.    CONCLUSION

In view of the foregoing, the Court is respectfully requested to adopt Steyr's proposed

claim constructions which are fully supported by controlling case law and the intrinsic evidence.

Respectfully submitted,

By its Attorneys

Dated:  June 25, 2018          /s/  Glenn T. Henneberger
                               Glenn T. Henneberger          Michael J. Persson
                               (pro hac vice)                (NH #12139)
                               Hoffmann & Baron, LLP         Lawson Persson & Chisholm, PC
                               6900 Jericho Turnpike         Post Office Box 712
                               Syosset, NY  11791            Laconia, NH 03247
                               Tel:  516.822.3550            Tel:  603.528.0023
                               gthdocket@hbiplaw.com         mike@laconialaw.com

***Attorneys for Plaintiff Steyr Arms, Inc.***

# CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2018, I electronically filed a true and correct copy of the

foregoing document PLAINTIFF STEYR ARMS, INC.'s SPR 6.1(e)(2) RESPONSIVE CLAIM

CONSTRUCTION BRIEF with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to all parties by operation of the Court's electronic filing system.

> Laura L. Carroll (NH 17444)
> Eric G. J. Kaviar (*pro hac vice*)
> Burns & Levinson LLP
> 125 Summer Street
> Boston, MA 02110
> Telephone:  617.345.3000
> Facsimile:  617.345.3299
> E-Mail:  lcarroll@burnslev.com
>                ekaviar@burnslev.com
>
> Attorneys for Defendant SIG Sauer, Inc.

> /s/  Glenn T. Henneberger
> Glenn T. Henneberger