UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Steyr Arms, Inc.

            v.                     Civil No. 17-cv-483-JD
                                   Opinion No. 2018 DNH 255
Sig Sauer, Inc.


CLAIM CONSTRUCTION ORDER

Steyr Arms, Inc. brought suit, alleging that Sig Sauer, Inc. is infringing U.S. Patent No. 6,260,301 ("'301 Patent"), which Steyr owns.  The '301 Patent pertains to a pistol with a plastic housing, and Steyr accuses Sig Sauer's P250 and P320 pistols of infringement.  The parties have filed their claim construction briefs, addressing five disputed limitations in the single claim of the '301 Patent.  A hearing was held on claim construction.


Standard of Review

In a patent infringement action, "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  "Claim construction seeks to ascribe the 'ordinary and customary meaning' to claim terms as a person of ordinary skill in the art would have understood them at the time of the invention."  Sumitomo Dainippon Pharma Co., Ltd. v. Emcure Pharms. Ltd., 887 F.3d 1153, 1157 (Fed. Cir. 2018)

(quoting Phillips, 415 F.3d at 1312).  Patent claims may be limited, however, by the patent's specification and prosecution history.  Id.  "A patent's specification 'includes both the written description and the claims' of the patent."  WesternGeco LLC v. ION Geophysical Corp., 889 F.3d 1308, 1323 (Fed. Cir. 2018) (quoting In re Packard, 751 F.3d 1307, 1320 n.11 (Fed. Cir. 2014)).  "[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law."  Teva v. Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 841 (2015).

## Background

The '301 Patent is titled "Pistol, Whose Housing is Composed of Plastic" and describes a pistol that is made from both plastic, to reduce its weight, and metal, to accommodate the forces that occur during firing.  As stated in the patent, the "invention relates to a pistol which comprises a housing composed of plastic, a barrel slide (which contains a barrel and a breech and is guided in the longitudinal direction with respect to the housing) and a trigger mechanism."  '301 Patent, col. 1, ll. 6-10.

The application that resulted in the '301 Patent was filed on August 13, 1999.  As presented in the application, the patent had four claims, an independent claim and three dependent claims.  The Patent Examiner rejected all four claims as anticipated by U.S. Patent No. 5,669,169 to Schmittter, et al., and rejected Claims 1 through 3 as anticipated by U.S. Patent No. 4,409,882 to Blackshaw, et al., and U.S. Patent No. 5,293,708 to Strayer, et al.

The applicant's counsel met with the Patent Examiner in December of 2000 to discuss the Office Action.  The Examiner completed an office communication document to reflect the meeting with counsel.  The interview summary states they discussed items 1-6 in the Office Action, discussed incorporating Claims 1 through 3 into one claim, and "Mentioned items 70 and 130 in combination (in Schmitter et al.)."  Doc. 46-10, at SIG001565.  The Examiner could not at that time make a determination about patentability.

As the result of the meeting, the application was amended to combine Claims 1-3 into a single claim, Claims 2 and 3 were cancelled, and Claim 4 was amended to answer a question about the means for locking the barrel.[1]  The Patent Office again

---

[1] The question, part of item 4 in the office action, asked "what portion or part of the multifunction metal part is intended to correspond to the claimed 'means for locking a barrel to the barrel slide'?"

rejected the application as being anticipated by Schmitter, et al.  In the Office Action, the Examiner determined that Claim 4 would be allowable if it were amended to include all of the limitations expressed in Claim 1.

In response, the applicant filed an amended application that cancelled Claim 4 and included the subject matter of Claim 4 in a single claim, Claim 1.  That claim was allowed, and the '301 Patent issued on July 17, 2001.  The single claim in the '301 Patent is:

> 1.  A pistol comprising a housing; a barrel slide movably mounted on the housing for movement in a firing direction with respect to a barrel; and a trigger mechanism located, at least in part, within the housing, the improvement which comprises a multifunction metal part removably insertable within said housing, said multifunction metal part being provided with guides for the barrel slide and means for supporting the trigger mechanism, said multifunction metal part and housing are each provided with a transverse hole which receives a shaft for connecting the housing and the multifunction metal part together, the housing has a rear wall which is provided with a recess for receiving a projection on the multifunction metal part the multifunction metal part includes control means for locking said barrel in the barrel slide.

In September of 2015, Steyr brought suit against Beretta USA Corp., alleging that Beretta infringed Claim 1 of the '301 Patent.[2]  In that case, the parties disputed three limitations in claim 1:

---

[2] Steyr's complaint against Sig Sauer in this case was also filed in the Northern District of Alabama but was transferred to this court by an order issued on October 11, 2017.

    (1) "means for supporting the trigger mechanism;"
    (2) "the multifunction metal part includes control means
    for locking said barrel in the barrel slide;" and
    (3) "housing has a rear wall which is provided with a
    recess for receiving a projection on the multifunction
    metal part."

Steyr Arms, Inc. v. Beretta USA Corp., 15-cv-1718-MHH, 2018 WL
1876345, at *5 (N.D. Ala. Apr. 19, 2018) (quoting claim 1, '301
Patent) ("Beretta").  The court construed the first two disputed
terms but held that the third term did not require construction
because its meaning was "clear on its face."  Id. at 13.

    Steyr filed suit against Sig Sauer in this case in May of
2017.  Following briefing, a claim construction hearing was held
on November 14, 2018.  Counsel for the parties presented slides
and argument to support their claim construction theories.

## Discussion

    Steyr alleges that Sig Sauer has infringed and continues to
infringe Claim 1 of the '301 Patent.  As stated in their Joint
Claim Construction and Prehearing Statement ("Joint Statement"),
the parties dispute the meaning of five limitations in Claim 1
of the '301 Patent.  The disputed limitations are:

    (1) "multifunction metal part,"
    (2) "means for supporting the trigger mechanism,"
    (3) "a transverse hole which receives a shaft for
    connecting the housing and the multifunction metal part
    together,"
    (4) "a rear wall which is provided with a recess for
    receiving a projection," and

(5) "control means for locking said barrel in the barrel slide."

Claim 1, '301 Patent.

The court in <u>Beretta</u> construed terms in Claim 1 of the '301 Patent based on intrinsic evidence, making the claim construction a legal determination.  While the claim construction order in <u>Beretta</u> is neither precedential nor controlling for purposes of this case, that court's reasoning and the legal principles applied may inform this court in construing the disputed terms that are presented here.[3]

A.   <u>Multifunction Metal Part</u>

Steyr proposes that the term "multifunction metal part" be construed to mean:

> A metal multifunction part removably insertable into the housing as a single part rather than individual component parts, the multifunction metal part including a projection, guides for the barrel slide, means for supporting the trigger mechanism, a transverse hole to receive the shaft for connecting the housing and the multifunction metal part together and control means for locking the barrel in the barrel slide.

---

[3] Steyr acknowledges the existence of the <u>Beretta</u> case but does not otherwise address that court's claim construction analysis or conclusions.  Sig Sauer asserts that the <u>Beretta</u> case is neither intrinsic nor extrinsic evidence for purposes of this case and states that the claim construction opinion "is of little value to claim construction in this case."  Sig Sauer also argues that the reference to the multifunction metal part in <u>Beretta</u> was wrong.

Steyr's proposed construction incorporates other terms and limitations in Claim 1 beyond the scope of the disputed term: "multifunction metal part." Sig Sauer proposes that the term be construed to mean: "a one-piece metal frame that serves multiple functions."

The real dispute is whether the multifunction metal part is limited to being "one piece" or instead can be formed from component pieces that are assembled before the part is inserted into the housing. Steyr contends that "one piece" would improperly impose a limitation that is not in the claim. Sig Sauer argues that as described and shown in the specification, the claimed multifunction metal part is one piece.[4]

The specification refers to the multifunction metal part as "a single, multifunction part." Col. 1, ll. 48-49; <u>see also</u> Abstract; Figs. 4, 5, & 6. The limitation of "single" suggests that the part is one piece. Steyr argues, however, that the patent uses the word "single" to distinguish the invention from prior art that used separate parts to accomplish the same purpose and that "single" does not limit the multifunction metal part to one piece.

_____

[4] Sig Sauer also asserts that Steyr disclaimed the use of multiple pieces to assemble the multifunction metal part during the prosecution of the patent application. For the reasons explained in Part E, construing "control means," the court is not persuaded that a disclaimer occurred.

The patent does not define "single".  In the Detailed Description section, the patent explains that the single, multifunction metal part "can be produced in various ways, being milled from solid, as a precision casting, by welding individual parts together, or even as a stamped sheet-metal part."  Col. 3, ll. 17-20.  Each described process would produce a one-piece part.  The patent does not describe assembling separate parts that would fit together as a metal multifunction part.  Taken in light of the ways to produce the multifunction metal part, the term "single" means formed as one piece that may be accomplished by milling from one piece of solid metal, from casting metal, from stamping the part from sheet metal, or by welding parts together into a one-piece part.

As such, the patent claims a multifunction metal part that is a single, one-piece, entity.  Although in one means of construction, the multifunctional metal part may be made from separate pieces that are welded together, once formed, the part is a single, one-piece, part that cannot be returned to separate pieces without harming or destroying the multifunction metal part.

Therefore, **multifunction metal part** is construed to mean:

**A single, one-piece metal frame that serves multiple functions.**

8

B.   Means for Supporting the Trigger Mechanism

The parties agree that the second disputed claim limitation is a means-plus-function limitation.[5] See 35 U.S.C. § 112(6). "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(6).[6] The court uses a two-step process to construe a means-plus-function limitation. IPCom GmbH & Co. v. HTC Corp., 861 F.3d 1362, 1370 (Fed. Cir. 2017).

---

[5] "If a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof." Mettler-Toledo, Inc. v. B-Tek Scales, LLC, 671 F.3d 1291, 1295-96 (Fed. Cir. 2012); Beretta, 2018 WL 1876345, at *9. In the Beretta case, the court found that the '301 Patent discloses a single embodiment and applied the Mettler-Toledo rule. Id. In this case, however, neither party has argued for a single embodiment theory, and when asked at the hearing, counsel disagreed with that part of the decision in the Beretta case. Therefore, the court will assume, without further analysis, that the Mettler-Toledo rule does not apply.

[6] Although 35 U.S.C. § 112(6) was replaced by § 112(f), effective September 16, 2012, the pre-amendment version applies here because the patent application was filed before that date. Chrimar Holding Co., LLC v. ALE USA Inc., 732 F. App'x 876, 884 (Fed. Cir. 2018) ("Paragraph 6 of 35 U.S.C. § 112 was replaced with 35 U.S.C. § 112(f) when the Leahy-Smith America Invents Act (AIA), Pub. L. No. 112-29, 125 Stat. 284 (2011), took effect on September 16, 2012. Because the applications resulting in the asserted patents were filed before that date, we refer to the pre-AIA version of § 112.").

"The court must first identify the claimed function. . . .  Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1351 (Fed. Cir. 2015).

In the Joint Statement, Steyr proposed that the phrase, "means for supporting the trigger mechanism," be construed as follows:

> A multifunction metal part including any desired holes and pins mounted therein such that the trigger and trigger parts are all mounted on the multifunction metal part, and equivalents thereof.
>
> The function is to "support" or mount the trigger mechanism.  Referring to the specification and drawings, the structure identified to support the trigger mechanism is the multifunction metal part including holes and pins mounted therein.[7]

Sig Sauer proposes that the phrase be construed as follows: "**(1) means -** a hole or other type of recess **(2) function:** for supporting the trigger mechanism — capable of securing at least one trigger component by receiving an insert."

_____

[7] For purposes of its claim construction brief, however, Steyr argues that the term should be construed using only the first paragraph, omitting the paragraph that addresses function. Steyr nevertheless states that "the function is clearly to 'support' or mount the trigger mechanism."  Based on the legal requirements for construing a means-plus-function term, the court understands Steyr's briefing to support the two-paragraph proposed construction in the Joint Statement and not to present an amended proposed construction.

1.  <u>Function</u>

The parties agree to some extent that the function of the "means for supporting the trigger mechanism" is to support the trigger mechanism.[8]  See also Beretta, 2018 WL 1876345, at *6. They disagree about the meaning of "supporting".  Sig Sauer construes supporting to mean "capable of securing at least one trigger component by receiving an insert."  Steyr proposes that supporting is synonymous with mounting.

The specification states that "[a] trigger **20** is mounted in a bearing pin **21**, which is inserted in the multifunction part **10**."  Col. 2, ll. 52-53.  That description goes on to use "mounted" and "supported" to explain the connections between the multifunction metal part and the trigger mechanism.  It concludes stating: "All the moving parts of the trigger apparatus are thus connected to the multifunction part."  Col. 2, ll. 60-61.  Therefore, the specification shows that "supporting" includes mounting and connecting.

2.  <u>Structure</u>

The Detailed Description section of the patent specification explains the structure for supporting the trigger

---

[8] Although Steyr proposes that the function be construed as "to 'support' or mount the trigger mechanism," there seems to be no dispute that the function is to support the trigger mechanism.

mechanism.  Col. 2, ll. 52-64; Col. 3, ll. 10-15.  That
structure includes pins that are mounted and inserted in the
multifunction metal through holes in the multifunction metal
part.

Sig Sauer's proposed construction, "a hole or other type of
recess," claims only a single hole, which is contrary to the
holes described and shown in the specification, and does not
include the pins that are described in the specification.  It is
difficult to understand how a single hole or recess could
support the trigger mechanism without a pin or pins.  Therefore,
that construction does not correspond to the claimed function or
the structure identified in the specification.

Steyr contends that the claimed structure is "[a]
multifunction metal part including any desired holes and pins
mounted therein such that the trigger and trigger parts are all
mounted on the multifunction metal part, and equivalents
thereof."  Steyr's proposed construction is taken from the
statement in the Detailed Description as follows: "The
description of an exemplary embodiment is not intended to limit
the invention in any way to a specific method of construction or
method of operation of a pistol.  Any desired holes and guides
can thus be applied to the multifunction part **10**, at any desired
points."  Col. 3, ll. 21-22 & col. 4, ll. 1-3.  Sig Sauer
objects to Steyr's construction on the grounds that it

12

improperly includes the multifunction metal part and fails to define "equivalents".

### a.  Multifunction Metal Part

Sig Sauer contends that including multifunction metal part in the construction is unnecessary because "it is already plain that the 'means' at issue is part of the [multifunction metal part] and causes improper redundancy in claim meaning."  Doc. 46 at 15.  Steyr contends that the holes and pins described in the specification cannot perform the function of support without the multifunction metal part.

Reference to the multifunction metal part does not cause redundancy.  In Merck & Co., Inc. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005), which is cited by Sig Sauer, the court explained that a narrow construction of the term "about" to require exactitude would improperly render another term in the claim superfluous.  That is not an issue here.  Multifunction metal part is construed as provided above, and reference to that part in the context of the trigger mechanism does not render either construction superfluous.

### b.  Equivalents

Sig Sauer also objects to Steyr's proposed construction on the ground that it includes the phrase "and equivalents thereof" without defining "equivalents".  In support, Sig Sauer argues

that the proposed construction would require, improperly, the jury to construe "equivalents". Steyr responds that § 112(6) includes equivalents and that determination of equivalents under § 112(6) and the doctrine of equivalents will be addressed in the context of infringement.

While some courts have decided not to include the term "equivalents" in construing means-plus-function claims, despite the mandatory language in the statute, neither the Supreme Court nor the Federal Circuit has addressed the issue. See, e.g., Northpeak Wireless, LLC v. 3Com Corp., 2015 WL 5117020, at *7, n.6 (N.D. Cal. Aug. 28, 2015) (citing cases). In any event, whether an accused device is equivalent to the claimed structure under § 112(6) is a factual determination that is first addressed, when appropriate, in the context of infringement. See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1266-68 (Fed. Cir. 1999). As a result, it appears to be immaterial whether "and equivalents thereof" is included as part of the construction of a means-plus-function claim term. See Keurig Green Mountain, Inc. v. Touch Coffee & Beverages, LLC, 2017 WL 2960517, at *16 (D. Mass. July 11, 2017).

   3. Construction

Therefore, the phrase **"means for supporting the trigger mechanism"** is construed as follows:

**Function:  To support the trigger mechanism and to connect it to the multifunction metal part.**

**Structure:  Pins and corresponding holes in the multifunction metal part, and equivalents thereof.**

C.   <u>A Transverse Hole Which Receives a Shaft for Connecting the Housing and the Multifunction Metal Part Together</u>

In the parties' Joint Statement, they identify the disputed limitation as "a transverse hole which receives a shaft for connecting the housing and the multifunction metal part together."  For purposes of its claim construction brief, however, Steyr expands the limitation as follows: "said multifunction metal part and housing are each provided with a transverse hole which receives a shaft for connecting the housing and the multifunction metal part together."  Steyr proposes that both of its versions of the disputed limitation be construed to mean:

> A housing and multifunction metal part including aligned transverse holes dimensioned to receive a disassembly lever shaft, the disassembly lever shaft received in the transverse holes and the projection received in the housing recess together hold the multifunction metal part firmly in the housing.

Sig Sauer addressed the disputed limitation as stated in the parties' Joint Statement.  It proposes that the phrase be construed to mean:

> A hole, located on the left or right side of the housing, configured to receive a rod-shaped object in

order to connect the housing to the multifunctional
metal part.

Steyr contends that Sig Sauer's proposed construction is
wrong because it describes a single hole instead of aligned
holes to receive the disassembly shaft and because of the broad
construction of the term "shaft".  Conversely, Sig Sauer argues
that Steyr's proposed construction improperly broadens the
meaning of "hole" and narrows the meaning of "shaft" to only a
disassembly lever shaft.

### 1.   Scope of the Disputed Phrase

Because the parties agreed in their Joint Statement that
the limitation in dispute was "a transverse hole which receives
a shaft for connecting the housing and the multifunction metal
part together," that is the phrase the court will address for
claim construction.  The additional parts of Steyr's restated
phrase and the related parts in the proposed construction are
not considered.  In particular, this disputed limitation does
not include "the projection received in the housing recess,"
which is part of another disputed limitation.

### 2.   Hole or Holes

The disputed limitation claims "a transverse hole."  Steyr
interprets that phrase to mean "aligned transverse holes" to
connect the housing and the multifunction metal part together.

Sig Sauer proposes a construction for "a hole" as a hole that receives a shaft to connect the housing to the multifunction metal part.

The claim states that "the multifunction metal part and the housing are <u>each</u> provided with a transverse hole."  Col. 4, ll. 13-14 (emphasis added).  As such, the patent claims aligned transverse holes on the housing and the multifunction metal part to receive a shaft for holding the multifunction metal part in the housing.

### 3.  <u>Shaft</u>

As used in the claim, the term "shaft" is the mechanism "for connecting the housing and the multifunction metal part together."  Steyr proposes to limit the meaning of "shaft" to a "disassembly lever shaft," which is discussed in the patent specification.  Sig Sauer proposes that "shaft", as used in the claim, must be construed based on its plain and ordinary meaning and, therefore, could be any "rod shaped object."

Steyr does not argue that it provided a definition of "shaft" in the specification that limits its meaning to "disassembly level shaft."  As such, Steyr does not attempt to show that it was acting as its own lexicographer for purposes of the meaning of "shaft".  See, e.g., Barkan Wireless Access Techs., L.P. v. Cellco P'ship, --- Fed. Appx. ---, 2018 WL

4151281, at *2 (Fed. Cir. Aug. 29, 2018) (discussing stringent requirements for defining a disputed term).

"Claim construction seeks to ascribe the 'ordinary and customary meaning' to claim terms as a person of ordinary skill in the art would have understood them at the time of invention." MasterMine Software, Inc. v. Microsoft Corp., 874 F.3d 1307, 1310 (Fed. Cir. 2017) (quoting Phillips, 415 F.3d at 1312-14). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314. In other cases, however, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art" which requires judges to examine "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. (internal quotation marks omitted).

### a.   Term of Art

Steyr argues that a "disassembly lever shaft" is a term of art that was known to those of ordinary skill in the art of

18

pistols at the time of the invention.  For that reason, Steyr
contends, a person of ordinary skill in the art of pistols would
understand that the shaft claimed for connecting the
multifunction metal part and the housing was a disassembly lever
shaft.

Whether a person of ordinary skill in the art would
understand "shaft" to mean "disassembly lever shaft" is not
readily apparent to the court.  Steyr did not provide any
extrinsic evidence, such as an opinion from an expert, to show
what a person skilled in the art of pistols would understand the
term to mean.  Instead, Steyr simply relies on the statements of
counsel that a person skilled in the art of pistols would
understand that "shaft" means "disassembly lever shaft."  The
court does not accept counsel's representations as appropriate
extrinsic evidence in this case.

b.  Shaft as Disclosed in the '301 Patent

Steyr also argues that because the specification only
discloses a disassembly lever shaft, "shaft" as used in the
claim means "disassembly lever shaft."  Steyr acknowledges that
limitations cannot be imported from the specification to the
claim but argues that instead it is using the specification to
show what a person of ordinary skill in the art would

understand.  See Phillips, 415 F.3d at 1320.  Sig Sauer disagrees.

A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313.  On the other hand, ordinarily the court cannot import limitations from embodiments described in the specification into the claim terms.  Id. at 1320.  Therefore, "it is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term." Thorner v. Sony Computer Entmm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotation marks omitted).

In contrast, "'[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention.'" Regents of Univ. of Minn. V. AGA Med. Corp., 717 F.3d 929, 936 (Fed. Cir. 2013) (quoting Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1308 (Fed. Cir. 2007)).  That is, a patent's use of specific language to describe "the present invention" or "this invention" in the specification is evidence that the claim is so limited. Verizon, 503 F.3d at 1308; Shire LLC v. Abhai, LLC, 219 F. Supp. 3d 241, 245 (D. Mass. 2016).  Stated in other words, a patentee

20

may disavow or disclaim a broader meaning of a claim term "based
on clear and unmistakable statements by the patentee that limit
the claims, such as 'the present invention includes . . .' or
"the present invention is . . .,' or 'all embodiments of the
present invention are . . . .'" Packing Techs., LLC v. Garmin
Int'l, Inc., 778 F.3d 1021, 1024 (Fed. Cir. 2015).

In the Summary of the Invention, the '301 patent summarizes
the invention without reference to the "shaft" or "disassembly
lever shaft."  Col. 1, ll. 47-51.  Further on, the patent
states: "In the case of a pistol having a disassembly lever
shaft which is mounted transversely in the housing, the
multifunction part in an advantageous development has a hole,
which holds the disassembly lever shaft and thus produces the
connection between the housing and the multifunction part."
Col. 1, ll. 62-67.  Then, the patent states: "The multifunction
part is thus connected to the housing without any specific
fastening means."  Col. 1, l.67-Col. 2, l.1.  Taken together,
those statements suggest that using a disassembly lever shaft is
only one embodiment of the invention.  Steyr does not point to
language that shows the invention is limited to a pistol with a
disassembly lever shaft.

Given Steyr's use of the broader term "shaft" in the claim,
the court cannot limit that term to "disassembly lever shaft"
based on the use of that more limited term, as an example, in

21

the specification.  See AIP Acquisition LLC v. Cisco Sys., Inc.,
714 Fed. Appx. 1010, 1016 (Fed. Cir. 2017) (citing Phillips, 415
F.3d at 1320).

        c.  Prosecution History

    Steyr also represents that its proposed meaning of "shaft"
is supported by an amendment to the patent dated December 1,
2000, which included Claims 2 and 3 in Claim 1.  Specifically,
Steyr quotes the applicant's statement on page 4 of the
amendment but misleadingly adds "[disassembly lever]" to modify
shaft.  Because the cited part of the amendment actually says
"shaft" and not "disassembly lever shaft," the amendment does
not show that shaft means disassembly lever shaft as Steyr
represents.

    Sig Sauer shows that Steyr used the term "disassembly lever
shaft" in claims of other related patents, a German patent with
a filing date of August 4, 1999,[9] and a patent application in a

_____

    [9] Doc. 46-3 at SIG002721:

    1. A handgun comprising a housing made of
plastic, a slide containing a barrel and a lock guided
longitudinally relative to the housing and a trigger
mechanism, and with a disassembly lever shaft mounted
transversely in the housing, wherein a single
multifunctional metal part is inserted removably into
the housing, and on which part, guides for the slide
are formed, **characterized in that** the elements (20,
22, 26) of the trigger mechanism are mounted and/or
guided in the multifunctional part (10), and in that
the multifunctional part (10) has a bore (15), which

European Patent Office Opposition proceeding dated July 12, 2006.[10]  Based on the claims shown there, Sig Sauer argues that when Steyr intended to limit a shaft to a disassembly lever shaft, it used that specific language.  While the cited extrinsic evidence supports Sig Sauer's argument, that evidence is not necessary to construe "shaft" without the limitation of "disassembly lever shaft."

    4.  <u>Construction</u>

Therefore, the disputed phrase, **"a transverse hole which receives a shaft for connecting the housing and the**

---

receives the disassembly lever shaft (14) and thereby creates the connection between the housing (1) and the multifunctional part (10).

[10] Doc. 46-9 at SIG002732:

Independent claim 1 of the sole remaining application of 11/14/2006 reads: "A pistol comprising a housing made of plastic, a barrel slide containing a barrel and a breech lock guided longitudinally relative to the housing and a trigger mechanism, wherein a single multifunctional part (10) made of metal with a bore (15) is inserted removably in the housing (1), and on which, the guides (34, 35) for the barrel slide (2) are formed, and in which all movable elements (20, 22, 26) of the trigger mechanism are mounted and/or guided, characterized in that the pistol has a per se known disassembly lever shaft (14) mounted transversely in the housing, whereby the bore (15) receives the disassembly lever shaft (14) and thus establishes the connection between the housing (1) and the multifunctional part (10)."

**multifunction metal part together,**" is construed as follows: **Transverse holes in the housing and in the multifunction metal part that are aligned to receive a shaft, which is not limited in shape, type, or kind, to connect the housing and the multifunction part together.**

D.  "<u>A Rear Wall Which Is Provided with a Recess for Receiving a Projection</u>"

Once again, having agree to the disputed limitation as stated in the parties' Joint Statement, Steyr expands the disputed limitation for purposes of its claim construction brief.  Steyr now identifies the disputed limitation as "the housing has a rear wall which is provided with a recess for receiving a projection on the multifunction metal part." Steyr's proposed construction is:

> The multifunction metal part is provided with a projection which engages in a recess in the rear wall of the housing for the purpose of removably inserting the multifunction metal part into the housing, the disassembly lever shaft received in the transverse holes and the projection received in the housing recess together hold the multifunction metal part firmly in the housing.

Sig Sauer uses the original and agreed disputed limitation and proposes the following construction: "The backmost wall of the housing which contains a hollow area, formed by an indent, hole, or cut-out, which hollow area is configured to receive an insert."

Steyr's proposed construction restates the claim language without providing any additional explanation as to the meaning of the limitation or its component terms but adds its construction of "shaft" as a disassembly lever shaft, which has been rejected.  Steyr otherwise argues that the terms "projection" and "recess" are common terms and have their ordinary meanings.

Sig Sauer proposes that "rear wall" be construed as the "backmost wall" and that "recess" be construed as "a hollow area, formed by an indent, hole, or cut-out" that "is configured to receive an insert."  As such, Sig Sauer apparently proposes that "recess" be construed to mean "hollow area" that is "formed by an indent, hole, or cut-out" and that "projection" be construed to mean "insert".  In support, Sig Sauer states that at the time of the invention claimed in the '301 Patent, based on a dictionary definition, "recess" meant "a cavity, gap, or space."  Sig Sauer cites generally to the patent to support the other constructions it proposes.  The terms "rear wall," "recess", and "projection" are not defined in the specification and are not limited by any further explanation or description.

In Beretta, Steyr argued that the terms used in the limitation were commonly understood and did not require construction.  2018 WL 1876345, at *12.  The court agreed with Steyr that the meaning of the phrase was "clear on its face" and

did not require construction.  Id. at *13.  Sig Sauer provides

no persuasive support for the limiting construction it proposes.

The court concludes that the phrase "**a rear wall which is

provided with a recess for receiving a projection**" is

sufficiently clear that it does not require construction.

E.  "Control Means for Locking Said Barrel in the Barrel Slide"

Steyr restates the disputed limitation as "the

multifunction metal part includes control means for locking said

barrel in the barrel slide."  Its proposed construction is:

> A bridge which spans the sides of the multifunction
> metal part, and equivalents thereof.
>
> With respect to the limitation "control means for
> locking said barrel in the barrel slide" the function
> is to lock the barrel shown in in Fig. 1 as reference
> numeral 3 in the barrel slide, reference numeral 2.
> Referring to the specification and drawings, the
> structure identified to lock the barrel in the barrel
> slide is a bridge 33 provided on the multifunction
> metal part.

Sig Sauer proposes that the limitation be construed as follows:

> **(1) means:** "control means" – a bridge-like portion of
> the multifunction metal part designed to engage a
> portion of a barrel
>
> **(2) function:** "locking said barrel in the barrel
> slide" – indefinite.

The disputed limitation is a means-plus-function limitation

that is construed under § 112(6).  As stated above, that

construction process requires the court to identify the function

and determine what corresponding structure, if any, is disclosed in the patent.

### 1.  Function

The parties appear to agree that the <u>claimed</u> function of the disputed limitation is to lock the barrel in the barrel slide.  See also Beretta, 2018 WL 1876345, at *11.  Sig Sauer, however, contends that the claimed function is indefinite because, as the mechanism works, the barrel slide actually controls or contributes to control the barrel.

Sig Sauer has not made it clear what effect its theory of indefiniteness would have on claim construction.  The issue of indefiniteness pertains to patent validity.  See Teva Pharms. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1340-41 (Fed. Cir. 2015) (discussing requirement of definiteness under § 112(2)).  For that reason, the court will not consider whether the claimed function is indefinite for purposes of claim construction.

Therefore, the function of the control means is to lock or contribute to lock the barrel in the barrel slide.

### 2.  Structure

The parties appear to agree that the corresponding structure is the bridge identified as "**33**" in Figures 5 and 6.  Steyr proposes that the corresponding structure be construed as "a bridge 33 provided on the multifunction metal part."  Sig

Sauer construes the structure as "a bridge-like portion of the multifunction metal part designed to engage a portion of a barrel."  The material difference between their proposed constructions is whether or not the bridge, which is the control means for locking the barrel, is a permanent part of the multifunction metal part.[11]

### a.  Specification

There are two references to the bridge "**33**" in the specification.  "In FIGS. **4, 5, 6**, the multifunction part **10** . . . comprises a right-hand and left-hand side part **30, 31**, which are connected to one another via a first bridge **32**, a second bridge, **33** (which, at the same time, is the control means for locking the barrel **3**) and, at the rear, by a third bridge, **36**."  Col. 2, ll. 65-68 & Col. 3. ll. 1-3.  In the Summary of the Invention section, the patent also states that "[i]n the case of a pistol having a barrel which can be locked in the barrel slide, the invention achieves a further simplification in that the control means for locking are [sic] formed on the multifunction part."  Col. 2, ll. 11-14.

The multifunction metal part is "[a] single, one-piece, part of a pistol."  Therefore, because the multifunction metal

---

[11] As noted above, although Sig Sauer also contends that the function of the bridge is indefinite, the court will not address that theory at this time.

part without any attachments includes the bridge, which is the control means for locking the barrel, the bridge must be part of the single one-piece multifunction metal part, not a removable attachment.  In addition, the statement that the bridge is "formed on the multifunction part" supports Sig Sauer's proposed construction that the bridge, as claimed, is a permanent part of the one-piece multifunction metal part.

> b.  Prosecution History

In further support, Sig Sauer contends that Steyr is estopped from claiming a removable structure based on the prosecution history of the '301 Patent.[12]  Steyr responds that the prosecution history estoppel doctrine Sig Sauer cites, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 733-34 (2002), applies only in the context of the doctrine of equivalents.  As is noted above, the application of the doctrine of equivalents and equivalents under § 112(6) is part of an infringement analysis, not claim construction, and will not be considered here.

---

[12] Sig Sauer states: "Steyr may argue that an 'equivalent' to a non-removable bridge is a removable bridge.  That argument must be rejected, however, because Steyr disclaimed such removable structures as possible equivalents during prosecution of the '301 patent."  Doc. 46, at *21.  As such, Sig Sauer is attempting to draw an equivalents analysis into claim construction.

Instead of prosecution history estoppel, Sig Sauer may have intended to restrict the meaning of the limitation through prosecution history disclaimer, which uses "the same general tenets" as prosecution history estoppel but applies to claim construction. Trivascular, Inc. v. Samuels, 812 F.3d 1056, 1063 (Fed. Cir. 2016). For disclaimer to apply, however, evidence of a restriction on claim scope cannot be ambiguous and instead must be clear and unequivocal. Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323-25 (Fed. Cir. 2003); see also Intellectual Ventures LLC v. T-Mobile USA, Inc., 902 F.3d 1372, 1378 (Fed. Cir. 2018) ("Disavowal is an exacting standard under which it must be established that the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term through expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." (internal quotation marks omitted)). Further, the party seeking to invoke prosecution history disclaimer bears the burden of showing "a clear and unmistakable disclaimer that would have been evident to one skilled in the art." Trivascular, 812 F.3d at 1063-64.

### i. '301 Patent

Sig Sauer argues that Steyr disclaimed or disavowed removable structures for locking the barrel during the prosecution of the '301 Patent. Specifically, Sig Sauer relies

on the interaction between the Patent Examiner and Steyr following the First Office Action, when all four claims were rejected as indefinite and as being anticipated.  The claims were rejected by the Examinaer as being anticipated by "Schmitter et al." because, among other things, the Schmitter patent disclosed a pistol with "d) a multifunction metal part, 70;" and "i) means for locking, 130."[13]  Doc. 46-10, p. 43, SIG 1560 (Office Action Summary, mailed on 09/29/2000).

Steyr requested and was granted an interview with the Patent Examiner.  The Interview Summary notes state that, among other topics, the participants "[m]entioned items 70 and 130 in combination (in Schmitter et al.)."  Based on that evidence, Sig Sauer states: "This must mean that the Examiner and Steyr discussed that elements 130 (unlock block) and 70 (rails) in Schmitter are separate and removable elements in connection with the question of whether the claims in Steyr's application, including claim 4, were anticipated by Schmitter."  Doc. 46, at *23.  Sig Sauer continues on to show that the claims were combined and that Steyr added the term "control" to describe the

---

[13] Sig Sauer also refers the court to two figures in U.S. Patent Number 5,669,169, with Schmitter, et al. listed as inventors.  Despite the Patent Examiner's statement in the Office Action, Sig Sauer represents that the Examiner's reference to "70" was to "rails" and the reference to "130" was to an "unlock block" shown in that patent.

means for locking the barrel.  Sig Sauer argues that the amendment disavowed a removable means for locking the barrel.

As presented, Sig Sauer's theory, at best, demonstrates wishful thinking.  Nothing in the cited exchange and amendment provides clear and unequivocal evidence of Sig Sauer's theory that the claim scope was restricted.  Therefore, Sig Sauer has not carried its burden based on the cited exchange with the Patent Examiner and the subsequent amendments to show prosecution history disclaimer.

### ii.  German Proceeding

Sig Sauer also asserts that Steyr disclaimed a removable bridge during a later prosecution of a related German patent application, DE 299 24 790 U1, for a handgun with a housing made of plastic.[14]  Specifically, Sig Sauer argues that one of its affiliates opposed that application based on an existing gun, Kel-Tec P11, and that Steyr responded that the challenged claim was not invalid because the removable pin in the cited gun was not a control means and was not a permanent part of the

---

[14]A court may consider extrinsic evidence for purposes of claim construction, although it is of less importance than the intrinsic evidence.  Phillips, 415 F.3d at 1317-19.  The Federal Circuit has at times considered foreign patent proceedings of related patents to construe patent terms, as long as that evidence is consistent with the intrinsic evidence.  See Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1374 (Fed. Cir. 2005); Alloc, Inc. v. Unilin Décor N.V., 2007 WL 5704047, at *17 (E.D. Wisc. Mar. 6, 2007).

multifunction metal part.  In response, Steyr states that evidence pertaining to foreign patent proceedings is extrinsic and that it did not disclaim any scope of the '301 Patent in the German proceeding.

The cited statement in the German proceeding is at best open to interpretation.  In this case, claim construction can be based on the intrinsic evidence.  As is explained above, the specification establishes that the bridge claimed in the '301 Patent is a permanent part of the multifunction metal part and is not removable.  For purposes of claim construction, no more is necessary.

### 4.  Construction

Therefore, the disputed limitation, "**control means for locking said barrel in the barrel slide,**" is construed as follows:

**The function is to lock or contribute to lock the barrel in the barrel slide.**

**The corresponding structure is a bridge that is an integral, inseparable part of the one-piece multifunction metal part and extends from the right-hand to the left-hand sides of the multifunction metal part, and equivalents thereof.**[15]

---

[15] To the extent Sig Sauer asks the court to impose a further limitation that the corresponding structure cannot include a removable pin, that is beyond the scope of the claim

Conclusion

For the foregoing reasons, the disputed limitations in claim 1 of the '301 Patent are construed as follows:

1. "Multifunction metal part"

   **A single, one-piece metal frame that serves multiple functions.**

2. "Means for supporting the trigger mechanism"

   **Function:  To support the trigger mechanism and to connect it to the multifunction metal part.**

   **Structure:  Pins and corresponding holes in the multifunction metal part, and equivalents thereof.**

3. "A transverse hole which receives a shaft for connecting the housing and the multifunction metal part together"

   **Transverse holes in the housing and in the multifunction metal part that are aligned to receive a shaft, which is not limited in shape, type, or kind, to connect the housing and the multifunction part together.**

construction analysis and may be addressed, if appropriate, in the context of infringement with respect to equivalent structures.

4.  "<u>A rear wall which is provided with a recess for receiving a projection</u>" is sufficiently clear that it does not require construction.

5.  "<u>Control means for locking said barrel in the barrel slide</u>."

**The function is to lock or contribute to lock the barrel in the barrel slide.**

**The corresponding structure is a bridge that is an integral, inseparable part of the one-piece multifunction metal part and extends from the right-hand to the left-hand sides of the multifunction metal part, and equivalents thereof.**

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

December 19, 2018

cc:  Laura L. Carroll, Esq.
     Glenn T. Henneberger, Esq.
     Eric G. J. Kaviar, Esq.
     Michael J. Persson, Esq.
     Robert R. Baugh, Esq.