```
                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * *
                                  *
STEYR ARMS, INC.,                 *
                Plaintiff,        *   17-cv-483-JD
                                  *   November 14, 2018
                v.                *   10:10 a.m.
                                  *
SIG SAUER, INC.,                  *
                Defendant.        *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MARKMAN HEARING
BEFORE THE HONORABLE JOSEPH A. DICLERICO JR.

Appearances:

For the Plaintiff:      Glenn T. Henneberger, Esq.
                        Hoffman & Barron LLP
                        6900 Jericho Turnpike, Ste 200
                        Syosset, NY 11791

                        Michael J. Persson, Esq.
                        Lawson Persson & Weldon-Francke PC
                        755 North Main Street
                        Laconia, NH  03247

For the Defendant:      Eric G. J. Kaviar, Esq.
                        Laura L. Carroll, Esq.
                        Burns & Levinson LLP
                        125 Summer Street
                        Boston, MA 02110

Court Reporter:         Sandra L. Bailey, LCR, CRR
                        Official Court Reporter
                        U.S. District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1454

1                     P R O C E E D I N G S

2              The Court has before it for consideration a

3      Markman hearing in civil case 17-cv-483-JD, Steyr Arms,

4      Inc. versus Sig Sauer, Inc.

5              THE COURT:  Kellie I believe informed you that

6      we are going to allow 40 minutes each for your arguments

7      and then if you would like, you could have an additional

8      ten minutes for rebuttal.

9              MS. CARROLL:  Thank you, your Honor.

10             THE COURT:  All right?  And we'll hear first

11     from Steyr.

12             MR. HENNEBERGER:  Good morning, your Honor,

13     Glenn Henneberger on behalf of Steyr Arms.

14             So what I've handed up to you, your Honor, is

15     just a handout of the slides that we presented, a copy

16     of the patent which I'm sure you probably have, and then

17     also a plastic housing from a Sig Sauer pistol which is

18     one of the accused products.  That was just so you could

19     kind of hold something in your hand.  I know at the

20     scheduling conference you wanted to maybe see something

21     or have one of the pistols.  All right, so that's what

22     you have before you.

23             All right, so we're going to go through the

24     subject matter of the patent.  Then we have five claim

25     terms that are at issue here.  First one being this

1  multifunction metal part.  Second one being a means for

2  supporting a trigger mechanism.  Third one being a

3  transverse hole for a shaft.  Fourth, rear wall with a

4  recess.  And control means for locking.  And that's for

5  locking the barrel in the barrel slide.

6      So the patent subject matter, when we look at

7  the patent, the abstract is a pretty good description of

8  what the patent is all about.  The multifunction metal

9  part is a frame or base on to which a lot of the

10 component, all the component parts of the pistol are

11 mounted.  And what they're doing there is they're

12 putting that in a plastic housing so that they can make

13 the pistol lighter, and use plastics instead of metals.

14     Now, one of the interesting things here in

15 this patent is the way that this multifunction metal

16 part is assembled as a complete unit and then put into

17 the plastic frame as a unit and then held in place by a

18 single disassembly lever shaft in combination with

19 projections on the back of the multifunction metal part

20 and recesses in the plastic housing.

21     So that was a new sort of unique way of

22 assembling the pistol, making it easy to disassemble for

23 repair and maintenance, and reassemble quickly.

24     THE COURT:  So are you saying it's the

25 multifunction metal part includes all of the moving

1    parts that are attached to it?

2          MR. HENNEBERGER:  Yes, your Honor.  So, I have

3    an exploded view next -- well, let's look at what -- if

4    we look here at the slide that's up on the screen now,

5    we've kind of colored this so you can see it a little

6    bit easier.  It's a difficult drawing to, you know, to

7    understand because it's a cross section of a lot of

8    component parts in the pistol.

9          So here the pink is the housing which is what

10   you have up there from the Sig Sauer pistol.  That's the

11   plastic housing.  That includes the trigger guard and

12   the housing for the magazine.  And then this orange

13   outline here is the multifunction metal part.  It's a

14   cross section of it.  And then there's also, you'll see,

15   a blue number 14, the reference number 14 runs up to

16   this blue, that's the disassembly lever shaft which is

17   in a hole in the multifunction metal part, and then in

18   the rear you have a projection 11, which fits in a

19   recess in the back of the plastic housing.

20         So, the multifunction metal part when it's

21   inserted into the plastic housing has two points of

22   contact.  So it's got the recess, the projection and the

23   recess, and then the disassembly lever shaft holding it

24   in the housing.  And these are some of the things that

25   we're going to be talking about.  The transverse hole is

1    what the disassembly lever shaft goes through and, you

2    know, we're going to get some of these other things that

3    are all in the claim.  And that's what the claim is.

4    The claim is a combination of a lot of different

5    component parts put together, so you can't really kind

6    of like separate them apart and say, you know, we're

7    just going to look at this little limitation.  You

8    really have to look at the claim as a whole and see how

9    all the parts cooperate with each so you can understand

10   what the claim is all about.

11            So now this is an exploded view of a Steyr

12   pistol that uses this configuration with multifunction

13   metal part.  We've mirrored this because to show you

14   some, when I get to the next slide, you'll see the Sig

15   Sauer pistols.  So the boxes around this multifunction

16   metal part that has the blue insert in the middle, that

17   blue insert is the control means, and we'll talk more

18   about that later on, and then you see at the back it has

19   two little extension --

20            THE COURT:  Is that the bridge?  Is that the

21   bridge?

22            MR. HENNEBERGER:  Yes, that's the bridge.

23            THE COURT:  The blue.

24            MR. HENNEBERGER:  The blue is the bridge.

25            THE COURT:  And that's part of this -- part of

1    the multifunction metal part?

2              MR. HENNEBERGER:  Yes.  Yes.  The

3    multifunction metal part includes that control means.

4         THE COURT:  All right.

5              MR. HENNEBERGER:  Then we have the green

6    projections on the back of the multifunction metal part

7    which fit in recesses in the rear wall of the plastic

8    housing.  And then the pink is the disassembly lever

9    shaft.  And you'll see that the plastic housing has

10   holes in it that are transverse and aligned with the

11   holes in the multifunction metal part.  We have the dash

12   line going through those holes to show how that

13   disassembly lever shaft is inserted through the housing

14   and the multifunction metal part.

15             THE COURT:  So, the multifunction metal part

16   as I look at it here is a, it's a single part.

17             MR. HENNEBERGER:  Correct.

18             THE COURT:  It's one piece.

19             MR. HENNEBERGER:  It's one -- it's one single

20   component part -- well, in the prior art which was

21   discussed in the patent, they were talking about a Glock

22   pistol, and in that there were smaller assemblies that

23   you had to put together and then insert them into the

24   plastic housing.  The invention is directed to taking

25   that multifunction metal part and then taking all these

1   other component parts, the trigger, you see that in the

2   box that shows some trigger components, there's all

3   sorts of little springs and things that go on, I mean,

4   you know, pistols are fairly complicated.  So what the

5   invention is all about was taking these base or frame

6   multifunction metal part, putting all these bits and

7   pieces together having a complete unit, and then taking

8   that unit and put it in --

9           THE COURT:  And put it in.

10          MR. HENNEBERGER:  Right.  And we'll talk about

11  that with the claims, and it's actually in the summary

12  of the invention.  The first sentence of the summary

13  says, which is right after the figures --

14          THE COURT:  I have a large copy of it.

15          MR. HENNEBERGER:  Okay.  So the first sentence

16  says, according to the invention the foregoing object,

17  the object of the invention is to provide a pistol which

18  allows use of plastics and which provides higher

19  provision and simple assembly.  And now the foregoing

20  object is achieved wherein a single multifunction metal

21  part is removably inserted into the housing and on the

22  multifunction metal part guides to the barrel slide or

23  form and the elements of the trigger are mounted and

24  guided.  And then it says, you know, it can be easily

25  moved in and out of the housing for maintenance and

1   repair.

2               THE COURT:  Right.  So, it is a single one-

3   piece part.

4               MR. HENNEBERGER:  You put all the pieces on to

5   the multifunction metal part and then you take that one

6   assembled component part and you stick it into the

7   housing, notwithstanding the barrel and barrel slide.

8               THE COURT:  What I'm trying to clarify is, is

9   the multifunction metal part what's shown here with the

10  blue bridge in it?

11              MR. HENNEBERGER:  Correct.

12              THE COURT:  And then you add other parts to

13  it.  Those are not part of the multifunction metal part.

14              MR. HENNEBERGER:  Well, they're included --

15              THE COURT:  Right?

16              MR. HENNEBERGER:  -- on to it when it's

17  inserted into the housing.

18              THE COURT:  These are mounted on to the part.

19              MR. HENNEBERGER:  Right, correct.  Yes, this

20  is a single component part.

21              THE COURT:  All right.

22              MR. HENNEBERGER:  All right, now this is an

23  exploded view of the Sig Sauer P250, one of the accused

24  products, and you'll see we've color-coded it the same

25  way.  They have the disassembly shaft, this pink goes

1    through the holes in the plastic housing, they have a

2    projection on the back of the multifunction metal part

3    which fits in a recess in the plastic housing, and then

4    they have a blue pin ten which gets inserted on to the

5    multifunction metal part before that gets put into the

6    plastic housing.

7              Now, once you put that pin on to the

8    multifunction metal part, you put it in the housing,

9    it's not removable once it's inserted and put into the

10   pistol housing.

11             And then this is the P320.  Same thing.  This

12   is assembled with the pin already on the multifunction

13   metal part.  Shows it being able to be inserted into the

14   plastic housing.  And that's the plastic housing that

15   you have up there, your Honor.

16             All right, so the claim is the claim we have

17   the five highlighted limitations at issue.  First one

18   being the multifunction metal part.  I think we've

19   spoken a lot about it already.  I'm not sure if you have

20   anymore questions about that.  It is a single component

21   part.  Everything gets assembled on to it and then it's

22   inserted into the housing.

23             And then here Sig Sauer's proposed

24   construction is a one-piece metal frame that serves

25   multiple functions.  I think we're pretty close on what

1    we, you know, on what it is.  It's a metal frame that

2    has a lot of component parts on it.  I guess the dispute

3    is whether you can read the term one piece into the

4    claim limitation which is not there.  We never use the

5    term one piece in the specification.  You're not

6    supposed to read limitations into the claims that aren't

7    there.  You are supposed to construe the claim in view

8    of the specification, but you're not, you know, your

9    role as the judge is not to read limitations into claim.

10   The Federal Circuit has abundant case law on this.

11            THE COURT:  But it does say a single.

12            MR. HENNEBERGER:  Yes.  But if you read it in

13   the context of what they're talking about, they're

14   talking about if you look at the background, and they're

15   talking about a Glock Model 17, so in the middle of that

16   paragraph it says the mountings of the parts for the

17   trigger and the control parts for locking the barrel are

18   individually inserted as assemblies into the housing

19   resulting in dimensional inaccuracies.

20            So they're saying that's a disadvantage.  And

21   then they solve that problem by creating this single

22   component part to mount all these things on and insert

23   into the housing as a complete unit.

24            THE COURT:  Right.  These are all -- at the

25   bottom of the detailed description it says, in

1    consequence all these parts can be mounted on the

2    multifunction part before the complete unit is finally

3    inserted into the housing.

4              MR. HENNEBERGER:  Correct.

5              THE COURT:  But we're talking about a single

6    one-piece part to which all these other parts are added,

7    and then it is inserted into the --

8              MR. HENNEBERGER:  Right, as opposed to

9    individual parts, yes, in the prior art, I agree, yes.

10             All right, so, our claim construction is here,

11   what we're proposing.  So it's a single part rather than

12   individual component parts.  And then these other

13   limitations are just things that are already in the

14   claim itself if you follow through the claim.  It says

15   that the multifunction metal part includes a projection,

16   guides for the barrel slide, means for supporting the

17   trigger mechanism, has the transverse hole, and it also

18   includes the control means for locking the barrel in the

19   barrel slide.

20             So we can move on to the second limitation at

21   issue, means for supporting the trigger mechanism.  And

22   again here I have a slide which is annotated and the

23   multifunction metal part includes a series of holes to

24   accept a series of pins to mount the trigger and the

25   trigger components on to the multifunction metal part.

1     Again, we're not real far off on the claim construction

2     here.  Sig Sauer proposes that it's a hole or other type

3     of recess and it's capable of receiving insert.  I'm not

4     really sure where this insert comes from.

5              What you're supposed to do -- a

6     means-plus-function claim is kind of a strange animal.

7     You're not really reciting structure, you're reciting a

8     function.  And then the structure is, your job is under

9     the statute to look at the specification and find what

10    structure corresponds to the function being claimed.

11             THE COURT:  Well, you agree that the function

12    here is to support the trigger mechanism; right?

13             MR. HENNEBERGER:  Correct.  So when you look

14    at the specification that we've never used the term

15    insert, so when you look it's a series of holes and

16    pins.  Holes in the multifunction metal part and pins to

17    hold those things on to the multifunction metal part.

18             Where we run astray here is under the statute

19    it says that we're entitled to, that our claim is

20    entitled to cover structure, the structure disclosed in

21    the specification corresponding to the function and

22    equivalents thereof, and that's by statute.  That's

23    literal infringement.  That's not doctrine of

24    equivalents.  That's literal infringement of a

25    means-plus-function claim.  Statutory includes

1    equivalents thereof.

2              Now, the determination of whether something is

3    an equivalent to what's --

4              THE COURT:  That for the infringement.

5              MR. HENNEBERGER:  That's an infringement

6    question which is a question of fact.

7              THE COURT:  We don't deal with that.

8              MR. HENNEBERGER:  You don't deal with that at

9    this point.

10             THE COURT:  Correct.

11             MR. HENNEBERGER:  And that's where we

12   disagree.  They seem to think that it's your job now to

13   determine what the equivalents are.

14             THE COURT:  Doesn't this patent really

15   disclose a single embodiment of the invention?

16             MR. HENNEBERGER:  No, not necessarily, because

17   there are alternatives.  They say the multifunction

18   metal part can be made of individual parts welded

19   together or stamped.  There's also a sentence at the end

20   that says it's not, you know, we're not necessarily

21   limiting the scope of the patent to this particular

22   thing.  There is, for example, it says you can use a

23   sear or it could use a hammer, you know, there are

24   alternatives in the patent itself.  It's not just one

25   embodiment.  I mean, there's one embodiment shown, but

1   there's other things described.

2          THE COURT:  Both sides have studiously avoided

3   the Beretta decision.

4          MR. HENNEBERGER:  I haven't avoided it, your

5   Honor, I provided it to you, but it's yours to do with

6   what you want.

7          THE COURT:  What's wrong with the way this

8   claim, this disputed claim was handled --

9          MR. HENNEBERGER:  My only issue with the judge

10  down in Alabama was that I think she went a little too

11  far on the means for supporting the trigger mechanism.

12  I think it's a little broader than what she interpreted.

13  It's really just the holes in the multifunction metal

14  part and the pins in the holes.  She kind of got lost in

15  the weeds about all the other things that are in the

16  specification.

17         THE COURT:  All right.

18         MR. HENNEBERGER:  But other than that I agree

19  with her, you know, with her decision.

20         THE COURT:  All right.

21         MR. HENNEBERGER:  And so I think we've covered

22  what our issue is with the means for supporting the

23  trigger.

24         Now, here is again, you know, this is the

25  multifunction metal part and housing are each provided

1   with a transverse hole which receives a shaft for

2   connecting the housing and the multifunction metal part

3   together.

4           So this is a cross-section from figure one

5   taken through the center of the disassembly lever shaft.

6   You see reference number one is the plastic housing;

7   reference number, I think 16 is the hole in the plastic

8   housing; 15 is the hole in the multifunction metal part;

9   and 14 is the disassembly lever shaft which goes through

10  the aligned transverse holes.

11          So, Sig Sauer's proposed construction, I think

12  they just forgot half the claim.  You know, they forgot

13  that it says that each of the housing and the

14  multifunction metal part each include a hole.  So here

15  their proposed construction is just a hole in the

16  housing which is not what the claim says.

17          THE COURT:  Well, there would have to be a

18  hole that goes through both.

19          MR. HENNEBERGER:  Right, well, the claim says,

20  it says a hole, each includes a hole.

21          THE COURT:  Right, right.

22          MR. HENNEBERGER:  So that's our construction.

23  Our proposed construction is that each includes a hole,

24  not just one.

25          And then the other --

1          THE COURT:  The hole has to be for a shaft.  A

2     hole can't, I mean, the hole doesn't support anything.

3          MR. HENNEBERGER:  Right, the hole is not doing

4     anything, right.

5          And then where we disagree again is the shaft.

6     You know, you're not supposed to read limitations into

7     the claim, but you are suppose to construe the claim in

8     view of the specification as one of ordinary skill in

9     the art would understand it.

10         So, in this particular instance the shaft in

11    the specification, we never call it a shaft.  It's

12    always the disassembly lever shaft.  And then I've put

13    up a slide here that shows it in the, you know, there's

14    a figure and it shows where the holes are, shows the

15    disassembly lever shaft, and then it also says that, you

16    know, on the second, the lower portion it says the

17    disassembly lever shaft is inserted into the holes of

18    the multifunction metal part and the holes in the

19    plastic housing.  The projections and the disassembly

20    lever shaft hold the multifunction part firmly in the

21    housing.  And that's what I was talking about earlier

22    when we were discussing the invention, how it has the

23    two points of holding that multifunction metal part in

24    the housing.  So it's the combination of the projection

25    at the back of the multifunction metal part and the

1    recess of the housing and the disassembly lever shaft.

2           And now the disassembly lever shaft also has

3    another function.  So, not only does it hold the

4    multifunction metal part in the housing, but it also is

5    the way that you lock the slide and barrel on to the

6    pistol.  And that's a well-known term of, you know,

7    that's how you do it.  I mean, when we saw it in the Sig

8    Sauer they had the same disassembly lever shaft or they

9    call it a, I think they call it a disassembly lever.

10   They don't use the word shaft.

11          THE COURT:  But it serves the function of not

12   only disassembly but also assembly.

13          MR. HENNEBERGER:  Right.  So it serves the two

14   functions of being able to assemble the pistol together

15   once you put the multifunction metal part into the

16   housing and you put the barrel and the barrel slide on

17   to the multifunction metal part guides, then you insert

18   the disassembly lever shaft, you turn it and it locks

19   all the component parts together, and then you have a

20   complete pistol.  So by having this one lever you can

21   take the whole pistol apart.  That's really, you know,

22   one of the ingenious things about what these inventors

23   figured out.

24          So here our proposed construction is, you

25   know, the housing and multifunction metal part both

1    include aligned transverse holes to receive the

2    disassembly lever shaft.

3              Now, I want to talk about that again.  You

4    construe the claim in view of the specification.  We

5    never just call it a shaft.  It's always a disassembly

6    lever shaft.  I think anybody skilled in the art looking

7    at the specification and reading it would understand

8    that that's what the claim is directed to, not just some

9    rod-shaped shaft.

10             All right, so now we've gone to the rear wall

11   with the recess.  Again, I don't think we're far off

12   here.  I don't think it needs to be construed.  I think

13   a jury can look at a projection on a component part and

14   say, yeah, that's a projection, and can look at the

15   recess in a housing and say, yes, that's a recess.  The

16   judge isn't necessarily required to construe every word

17   in every claim.  I think this is clear on its face.  I

18   don't think it really requires construction.  And the

19   judge in Alabama also agreed that it didn't require

20   construction.

21             So, I think that's where we disagree amongst

22   ourselves here.  They're presenting to you that it

23   should be some, you know, take a dictionary and replace

24   the words with more words, and I don't think that's

25   necessary.

1              And again, they use the word insert.  I don't

2    know, you know, we've never used the word insert

3    anywhere in the specification, so.

4              Now we're moving on to the final one already,

5    which is the control means for locking the barrel and

6    the barrel slide.  You know, this is a, this is

7    something that we disagree on most of it.

8              So Sig Sauer proposes it's a bridge-like

9    portion of a multifunction metal part, and they say that

10   locking the barrel and the barrel slide is indefinite.

11   Obviously we disagree with that.

12             During the prosecution of the patent the

13   examiner did raise an issue because it was originally in

14   a claim, it just said means for controlling -- means for

15   locking the barrel and the barrel slide.  He rejected

16   the claim as being indefinite.  They made an amendment

17   to say it was the control means, and the examiner

18   accepted that and, you know, the case went on to be

19   allowed eventually.  It didn't raise a further objection

20   to indefiniteness.

21             Now, again, it's one of these things where if

22   somebody you ask to look at this is somebody of ordinary

23   skill in the art, looking at the figures, reading the

24   specification, and they would understand how that

25   disassembly lever shaft, how the means, how the control

1   means controls the action of the barrel and locks the

2   barrel and the barrel slide.  So therefore it's not

3   indefinite.

4          And if we look at -- I just put up a slide

5   here.  Let me see.  Make sure it's the right one I want

6   to show you.

7          THE COURT:  That's the second bridge which is

8   part of the multifunction metal part.

9          MR. HENNEBERGER:  Right.  So, when I was

10  looking -- when we were looking at the exploded views,

11  that was the blue.

12         THE COURT:  Right.

13         MR. HENNEBERGER:  All right?  So here it's

14  orange in this particular cross-section.  And you see

15  the barrel is in yellow and the barrel slide is in pink.

16  And these control attachments on the barrel, number

17  four, they have two attachments which point downward,

18  and one, the rear one rests on top of the second bridge

19  here, the control means.  And what the control means is

20  doing here is it's holding up that rear barrel control

21  attachment.  And then you'll see up here where I've

22  circled here, this shows where the barrel has a step and

23  the slide has a hole.  So this control means or bridge

24  holds up the rear of the barrel which holds this step in

25  the hole of the barrel slide and therefore it's locked

1    and ready to be fired.  Once the pistol is fired, the

2    barrel slide moves backwards.  The barrel tilts and

3    moves backwards.  And then you'll see that gap between

4    the two control attachments will move downward and into

5    -- and will be stopped from further movement by the

6    bridge.

7                    THE COURT:  Now --

8                    MR. HENNEBERGER:  So that's the control

9    function.  It controls the movement of the barrel.

10                   THE COURT:  Show that on there for me.  I'm

11   not quite --

12                   MR. HENNEBERGER:  Okay.

13                   THE COURT:  So the bridge is holding up the --

14                   MR. HENNEBERGER:  So right.  Where I put the

15   pencil here, right, that's the bridge.  And then it's

16   holding up this rear control attachment on the barrel

17   where I just put the dot.  And then where we have

18   circled the barrel is locked, you see there's a step on

19   the barrel, top of the barrel, and it fits in a hole in

20   the barrel slide.  So it's locked in position there.

21   So, because the barrel is being held up, it's being

22   locked in that position.

23                   Now when you fire the pistol, the barrel moves

24   down and backwards.  And then what happens is this

25   control means ends up going into that space between the

1   two barrel attachments, the control attachments, and

2   you'll see it's shaped to the same shape.  So what that

3   does is it controls the movement of the barrel.  So

4   initially it's up in the locked position, the pistol is

5   fired, the barrel and the barrel slide both move

6   backwards, and what happens is that barrel tilts

7   downward and backwards and that allows the cartridge to

8   be ejected through the hole in the barrel slide, and

9   that hole creates that step where the barrel is locked

10  in that hole.

11          I know it's kind of hard to see here and it's

12  difficult to explain, but somebody of ordinary skill in

13  the art who is familiar with pistol designs and familiar

14  with this kind of thing, you know, the specification

15  talks about it, if the pistol is provided with a tilt, a

16  barrel that tilts, you know, then you use the control

17  means.  So, somebody of ordinary skill in the art

18  reading the specification looking at the figures would

19  clearly understand that that's what's being discussed

20  and being claimed.

21          And unfortunately you and I are not

22  necessarily persons of ordinary skill in the art.  The

23  examiner was, you know, and other folks who have

24  experience in design and engineering these types of

25  products.

1           I have to clear this.  All right, so, I have

2      another slide here.  This is just a top view of the

3      multifunction metal part which includes the control

4      means.  So, we have said it's a bridge which spans the

5      sides of the multifunction metal part equivalents

6      thereof.  And in the claim, that's another thing, the

7      claim says the multifunction metal part includes control

8      means.  Now, the term includes as an open-ended

9      transitional phrase kind of like comprises.  So, it

10     doesn't say that it has to be part of it or formed on it

11     or anything like that.  It just says that the

12     multifunction metal part includes the control means.

13          So I think that's, again, where we disagree.

14     They seem to think that it has to be integral with the

15     multifunction metal part, and I don't think that's

16     necessarily true.  The claim doesn't say that.  And

17     that's -- I think that's where we disagree.  I think

18     they also say it's a bridge, so.

19          And then the next thing we have here is they

20     start, Sig Sauer has raised the issue of prosecution

21     history estoppel and I guess disclaimer.  Any disclaimer

22     has to be clear and unmistakable.

23          During the prosecution Steyr only added claims

24     that were already existing in the original filing back,

25     you know, into the claim one.  So there's different

1   kinds of claims.  There's an independent claim and then

2   there were dependent claims.

3       And what Steyr did, there was one independent,

4   three dependent claims, and in the end the allowable

5   claim was the combination of one, two, three and four,

6   and they really didn't, there were no specific arguments

7   saying anything, you know, there was an interview with

8   the examiner, there's an examiner interview summary

9   which basically summarized the fact that they chatted

10   about the prior art.  I guess there was a suggestion to

11   add claims two and three into the claim and maybe it

12   would be allowable then, so that's what they did.  They

13   amended claim four to add that control, the word control

14   so that it was no longer indefinite as far as the

15   examiner was concerned.  So, there was no clear and

16   unmistakable disclaimer anywhere in the prosecution

17   history.

18       Sig Sauer raised as an issue with a German

19   opposition proceeding which was done subsequent to the

20   U.S. patent issuing, they made a statement that we

21   didn't bring the, this Kel-Tec prior art to the

22   attention of the patent office, but we couldn't have

23   because the patent had already issued.  There's no

24   mechanism at that point to bring something to the

25   attention to the patent office.  And the German

1   opposition proceeding at a European opposition were both

2   resolved in favor of Steyr and the claims were held to

3   be valid and enforceable, so, and the claims in the U.S.

4   case are similar but different.

5          That's also extrinsic evidence, foreign

6   prosecution.  The Federal Circuit is not very enthralled

7   with using that to limit the scope unless there's some

8   really specific fact pattern where things were said or

9   done, that the cases are few and far between where they

10  use foreign prosecution to limit the scope of a U.S.

11  case.  And in this case there was nothing said or done

12  in the foreign prosecution that we feel would be a

13  disclaimer or something like that.

14         Now, Sig Sauer refers to this Kel-Tec P11, and

15  I'm going to just run through why, you know, the

16  arguments that were made and why this Kel-Tec was not

17  held to be invalidating prior art, at least in the

18  German opposition proceeding and the European

19  proceedings.

20         So, we have colored here three pins.  Now

21  those three pins are the pins that hold the metal frame

22  into the plastic housing.  I'm going to have to draw

23  some stuff here.  All right, so, they have a disassembly

24  lever shaft or an assembly pin which is this 110, the

25  pink, which is right here.  That only goes through a

1  hole in the metal frame or metal chassis.  It does not

2  go through -- it sits on top of the plastic housing.

3  You see there's two cutouts at the top of the plastic

4  housing.  That fits in one of those two cutouts.  So

5  there's no, that particular assembly pin doesn't go

6  through both the chassis and the plastic housing.  And

7  that's one of the things that was being argued in

8  Germany, was that -- let me say one other thing.  So

9  their assembly pin is a dual function pin like ours,

10 except their second function is not to mount it into the

11 -- not to mount the frame into the housing.  It's to be

12 the control means.  So, once this is assembled, then

13 that provides the control means for the barrel.  And

14 what they were saying in the German opposition

15 proceeding was that this is not included on the

16 multifunction metal part when that complete unit is put

17 into the plastic housing.  And that also doesn't serve

18 the function of holding the metal frame, the completed

19 unit, into the plastic housing.  They actually have to

20 have separate pins.

21       So, I think Sig Sauer is misunderstanding what

22 the German attorney was saying.  He was saying, well,

23 you know, it can't be, the assembly pin which assembles

24 the barrel and the barrel slide on to the pistol, it

25 can't be, it's not part of the multifunction metal part

1    when it's inserted as the complete unit.  It's only put

2    in afterwards.  So therefore it's not included on the

3    multifunction metal part.

4            Now the other thing that this doesn't have

5    that the patent discloses is the projection and the

6    recess.  If you look here, there is some sort of, you

7    know, there's some sort of projection on the back of the

8    chassis or frame, but it fits in a hole in the back of

9    the plastic housing.  As a matter of fact, that has no,

10   it doesn't help to hold the -- it doesn't create a

11   second point of connection between the multifunction

12   metal part and the plastic housing.  As a matter of

13   fact, they need to use a pin which goes through to

14   create a point of connection between the frame and the

15   plastic housing.

16           So there's two things there.  So there's no

17   recess with projection and the control means is not

18   included on the multifunction metal part as part of the

19   unit that gets inserted into the plastic housing.  So

20   that's what they were saying.

21           And I think I'm pretty much done unless you

22   have some questions for me.

23           THE COURT:  All right.  That's fine.  Thank

24   you.

25           MR. HENNEBERGER:  All right, thank you, your

1    Honor.

2              THE COURT:  Mr. Kavair.

3              MS. CARROLL:  My colleague -- Laura Carroll

4    for Sig Sauer, and this is my colleague Eric Kaviar.

5    He's going to do the presentation.  I also just want to

6    take a moment that we've got two representations of Sig

7    Sauer here in the courtroom avidly watching this as

8    well.  Thank you.

9              MR. KAVIAR:  Good morning, your Honor.

10             THE COURT:  Good morning.

11             MR. KAVIAR:  May I proceed?

12             THE COURT:  Yes.

13             MR. KAVIAR:  As my colleague mentioned, I'm

14   Eric Kaviar.

15             So today I'm going to go over a few different

16   things.  I'm going to start with an overview of the

17   asserted patent.  As you might not be surprised, I have

18   a slightly different view from my brother as to sort of

19   the scope of this patent and what the purpose was.

20   We're going to then take a look at the actual claim

21   language itself which defines the invention.  Then I

22   want to spend the most of the time today, your Honor, if

23   you'll allow it, addressing the potentially dispositive

24   claim construction terms.  There are a couple terms that

25   are construed in our view correctly, will end this case.

1    The remaining terms are, as you could probably tell from

2    my brother's presentation, things that they want

3    construed in a certain way to avoid invalidity of what

4    is a pretty powerful reference.

5              So starting with the patent, we're going to

6    call it the '301 patent as my brother did.  As you know,

7    it's directed to a pistol that has a plastic housing.

8    It was filed in 1999.

9              Now, according to the patent the problem to be

10   solved was that metal pistols are strong but they're

11   very heavy, so it was desirable to make them lighter.

12   Now, how do you do that.  Well, plastic, and there's all

13   sorts of types of plastic, can help you save weight, and

14   you can actually make a whole lot of components out of

15   it, but a gun has a small explosion that occurs every

16   time it's fired and that exerts very high forces, and

17   that resulting energy is not easily controlled by most

18   plastics.

19             The solution here as identified by the patent

20   itself is that you're going to use a single metal frame

21   called the metal multifunction part or MMP --

22   multifunction metal part I should say.  The MMP fits

23   into the plastic housing to serve as rails for the

24   barrel as well as a frame for the trigger assembly.

25             Now, at the time of the invention this wasn't

1   a new concept.  There were metal prior art frame

2   assemblies that addressed the problem.  In this patent

3   itself, they expressly call out the Glock.  And they say

4   that the problem with the Glock is that there are all

5   these individually coated parts, they have to be

6   separately put in, and it's difficult to assemble,

7   difficult to disassemble.  As you can see from this

8   image, your Honor, these are some of the components.

9   It's kind of separate distinct items that make it

10  difficult to sort of disassemble, reassemble,

11  manufacture.

12          Also in the prior art at this time is the

13  Kel-Tec pistol.  My brother introduced it.  The Kel-Tec

14  pistol we think is very close to the actual patent.  The

15  main difference, as you can see here, if I can get my

16  pointer to display, but in any event, the main

17  difference here is that the MMP here has a bridge and

18  the bridge is a separate component.  That's really the

19  only meaningful difference.  All this other stuff is I

20  think a very extraneous argument and was extraneous to

21  the German patent office as well.

22          Now, we do say Steyr did not disclose the

23  Kel-Tec P11 to the U.S. Patent Office.  Now granted, the

24  first time the P11 got put before a government body was

25  in Germany after this patent issued.  But we believe, on

1    information and belief, Steyr's is a sophisticated

2    entity, it closely monitors its competitors, this was a

3    popular novel gun, there were articles on it in all

4    sorts of gun magazines, it created quite a bit of press

5    when it came out, on information and belief we think

6    they probably knew about this patent while the '301

7    patent was pending, and we would get to that should the

8    case move forward in that direction.

9            So then looking at all the different prior

10   art, what's the distinction between the claimed

11   invention and the stuff that came before it.

12           According to the patent itself it's this

13   concept of a single metal multifunction part.  And here

14   they're using the term single as a reference to a single

15   piece, one piece.  You compare that to the prior art on

16   the fact of the patent.  It's constantly referencing

17   that there are multiple parts, they're difficult to fit

18   in because there are multiple individual parts.  It's

19   talking about a frame assembly rather than just a single

20   metal part.

21           And again, what's the purpose of the

22   multifunction metal part?  Well, there's a variety of

23   purposes, but one of them according to the patent, is to

24   include control means for locking the barrel slide.

25           So, my brother seems to suggest that include

1   somehow is open-ended enough to suggest that it doesn't

2   need to be attached or, I think that fails as a matter

3   of grammar in claim construction.  I think when you're

4   making a statement that a frame includes this component,

5   you're stating that that's a part of the frame, that's

6   the part of the single piece of metal.  So that's our

7   position and we'll get to that in more detail.

8           In case it's helpful to the Court, we've

9   annotated some figures from the patent.  Here we're

10  calling out the MMP.  It's called out in yellow.  And in

11  particular this control means on quote, unquote, that

12  they're claiming is highlighted or I should say

13  annotated by the red dash.  That's an internal part that

14  will be connecting one side of the MMP to another side

15  of the MMP.

16          THE COURT:  That's the bridge, is that what's

17  referred to as bridge number two?

18          MR. KAVIAR:  Correct, your Honor.  33 is the

19  control means -- I'm sorry, your Honor, yes, it is also

20  referred to the second bridge.  I'm sorry.  And this is

21  also seen in figure six and five.  Again, we've

22  annotated these to show it's again being depicted as

23  always as a single one-piece frame and the MMP is a part

24  of that frame.

25          So, if you will indulge us we just have a

1  quick animation to show how this works.  Even us, as

2  patent attorneys, when we first saw the patent we were

3  trying to figure out how things moved.  So this

4  animation will give you --

5          THE COURT:  You think you're trying to figure

6  it out.

7          MR. KAVIAR:  Well, we hope this helps.  So

8  this is a figure, we've sort of streamlined it.  This

9  isn't all in the patent, but this is how it would

10  operate.

11          You have a bullet.  You pull the trigger.  It

12  ignites the powder.  Bullet flies out.  This exerts a

13  lot of pressure.  The barrel and the barrel slide come

14  back together.  I just want to pause it right here.

15          So, what's happened.  All right.  Bullet's

16  been fired.  Both the barrel and the barrel slide

17  because of the pressure of the bullet coming out of the

18  barrel at a very high velocity, are moving backwards.

19  Now, the barrel itself contains, they call them control

20  attachments, it's basically these two little prongs,

21  right.  And then in between the prongs there's a groove

22  that is created by the presence of the prongs.

23          So, what happens is as it comes backwards the

24  control attachments catch the MMP, and by catching it,

25  brings it down at a slight angle.  Now, as that's

1  happening this prevents the barrel from moving any

2  further back.  So the barrel at this point, until it

3  receives another push, will stay in this kind of

4  position where it's got the control attachments pressed

5  against the quote, unquote, control means.

6          The barrel slide keeps independently moving

7  backwards.  And I can keep the video going.  But the

8  barrel slide is not controlled by the frame itself here.

9  It hits a different portion, it's not controlled by this

10 control means.  The slide I should say, barrel slide,

11 independently travels backwards and then comes back and

12 returns and brings forward the barrel to put it back

13 into breech.  And this is on a loop, so I'll just show

14 you one more time.  You can see it as many times you

15 want, I've included it with the materials, but.

16          And just because we've removed the colors for

17 these kinds of animation firing segments, I'll just go

18 over the colors just so those make sense.  I think I

19 have to go forward one.

20          So just to be clear.  Yellow represents the

21 MMP.  Orange represents the barrel.  And the gray

22 represents the -- the dark gray represents the barrel

23 slide.  The firing pin is in a light gray and the

24 trigger is in light gray, they're not kind of critical

25 to this discussion.

1          So, that's the patent description of the

2    invention and that's how we envisioned it working in the

3    annotated embodiment.

4          So let's look at Steyr's commercial

5    embodiment.  Steyr's commercial embodiment is entirely

6    consistent.  The multifunction metal part in Steyr's

7    embodiment is one piece, one single piece of metal, and

8    the quote, unquote, control means is a portion of that

9    larger piece of metal.

10          Now, the claimed invention.  As you're aware,

11    the claim came out of prosecution in sort of a haphazard

12    way.  It's a very long claim.  It's not broken apart

13    particularly well.  What we did is we just are

14    annotating it here into different segments, A through I.

15    The portions that we're attempting to construe today and

16    argue our positions to your Honor are the ones called

17    out in red.  So we have the multifunction metal part,

18    means for supporting trigger mechanism, the transverse

19    hole limitation, the rear wall limitation, and the

20    control means limitations.

21          So, why do these claims matter?  Well, the

22    multifunction metal part and the control means

23    limitations are directly relevant to noninfringement.

24    Our products, as my brother previewed, in our products

25    we don't have a single multifunction metal part, and we

1    certainly don't have control means that's a portion of

2    that metal part.  Our product in relevant part operates

3    similar to the P11 and in our view other guns that came

4    before it, and that there's a pin that's serving the

5    function of catching that barrel when it comes back, and

6    that's shown in this picture.  And again, like the prior

7    art, the accused products have a multipiece frame.

8              Now, and we'll get to it in a minute in more

9    detail, but I disagree with my brother.  I think it's

10   pretty plain Steyr told the German patent office that

11   the control means cannot be a removable pin.  It made

12   other arguments, some of which my brother alluded to,

13   but that was a very clear argument that was asserted.

14   And again, another reason why this is important, Steyr

15   also admitted to the U.S. Patent Office that a

16   multipiece frame did not qualify as an MMP.  And in a

17   minute I'll get to why that is clear on this.

18             Now, the other claim terms as I presume you

19   can tell from my brother's presentation, those are most

20   relevant invalidity.  In particular they're trying to

21   get around the Kel-Tec reference, and before even

22   Kel-Tec came into existence there was the Grenbel P10

23   and P30, which is by the same manufacturer.  And

24   regardless, just as an aside, even if Steyr's positions

25   are adopted for those constructions, we think the patent

1    claim one will be at least obvious.

2              So now to the potentially dispositive claim

3    terms.

4              So, Sig Sauer's proposal is that the

5    multifunction metal part should be construed according

6    to all the disclosures and the limitations and

7    statements made during different prosecutions.  It

8    should be construed as a one-piece metal frame that

9    serves multiple functions.  We'll get to why my

10   brother's proposal has some problems with it in a

11   moment.  But you can just see from the image here,

12   Steyr's proposal has a lot of words in it.  It's not

13   particularly helpful to a jury to actually understanding

14   the scope of the claim, and that's really why we're

15   here.  We're here to resolve, your Honor, I believe

16   under 02 Micro and other cases, we're here to resolve

17   party disputes as to the meaning of the claim, but also

18   to provide the jury with clear guidance as to what the

19   claims mean.

20              So, it's important to note that multifunction

21   metal part doesn't have a plain and ordinary meaning.

22   So it's not as if, as my brother is suggesting, the

23   specification and embodiments and all of this are so

24   irrelevant.  If you had a claim term let's say like

25   shaft, shaft has a very clear meaning.  If you have a

1   term shaft and you look at specification, you might be

2   able to tell, okay, they're just discussing one example.

3   But when you have a term that has no plain and ordinary

4   meaning, you're actually using the specification to try

5   to figure out what it means, to try to provide

6   definition, and there's lot of principles that we'll go

7   into in a moment that show why that's important and sort

8   of what canons matter when you're kind of cobbling

9   together a meaning for something that ordinarily doesn't

10  happen.

11          And this is just to follow-up, as in Phillips

12  and other cases, the intrinsic evidence then becomes

13  really important.

14          So let's go back.  A canon in a claim

15  construction that you look to the purpose of the

16  invention as a sort of one thing to give you a hint as

17  to what something means.  So here the purpose of the

18  invention is clearly stated.  You're going to replace

19  the prior art metal frame assemblies containing multiple

20  parts with a single metal multifunction part.

21          Then you turn to the next canon.  Another

22  canon of claim construction is that if every single

23  embodiment depicts the same exact thing, then that's

24  probably very important to the meaning of that thing,

25  and here that thing is the multifunction metal part.

```
 1    Every single embodiment of the claim of the
 2    multifunction metal part is consistently and exclusively
 3    described as being a one-piece metal frame.  And here's
 4    a passage, I can get to it in a moment, but this is one
 5    place where we disagree with the Alabama court.  Alabama
 6    court read this and thought -- let me just read the
 7    passage.  The multifunction metal part can be produced
 8    in various ways, being milled from a solid, as a
 9    precision casting, by welding individual parts together,
10    or even as a stamped sheet metal.  My understanding is
11    the Alabama court looked at the statement welding
12    individual parts together and said, well, that doesn't
13    mean it's one piece.  Respectfully, your Honor, what
14    we're suggesting one piece means, and maybe we can pick
15    another term if that's more precise for the court, but
16    what we're suggesting one piece means is to take it
17    apart requires destructive force.  It's not something
18    that's being disassembled and reassembled according to
19    some plan and, you know, precision cuts and things of
20    that nature.  It's if you've got to take this thing
21    apart, you've got to break it, and that's where we
22    dispute the Alabama court there.
23            I'd also say in general we disagree with a lot
24    of the constructions from the Alabama court, but they
25    weren't provided, the Alabama court was not provided
```

1    with all of the intrinsic and extrinsic evidence that

2    you're being provided with, they weren't provided with

3    the German and European file histories as well I

4    believe.

5              So, another principal that we deal with is

6    that there's this written description requirement.  Now,

7    the written description requirement is all about has the

8    inventor aptly provided the world with notice of the

9    scope of the claims.  And it's really like a notice

10   description of the invention type requirement.

11             Now, if you find that this metal --

12   multifunction metal part can be a combination of

13   removable parts, that would actually expand the claims

14   beyond anything that's ever been described as a

15   multifunction metal part in the patent itself.  So, as a

16   matter of Federal Circuit law that's a no no.

17             THE COURT:  I thought Mr. Henneberger agreed

18   that the MMP was a single piece.

19             MR. KAVIAR:  I was confused as to that point,

20   your Honor.  I believe he was being very precise in some

21   answers and saying that certain embodiments disclosed in

22   a certain way.  I would be very happy to hear that he's

23   agreeing that the multifunction metal part is a single

24   piece and it includes the control means.

25             THE COURT:  And then you attach these other

1  pieces to it and put it in.  But the part itself is a

2  single piece.

3          MR. KAVIAR:  Correct.  And some of the pieces

4  are attached after it's put in.  But yeah, those aren't

5  part of the multifunction metal part.  I don't believe

6  my brother went as far as that, but I won't speak for

7  him.

8          THE COURT:  Well, he can speak again later.

9          MR. KAVIAR:  Okay.  Well, I hope you ask him

10  that question.

11          THE COURT:  In case I misunderstood him.  But

12  that's the way I -- I asked several questions about it

13  to try to zero in on that.

14          MR. KAVIAR:  I hope he answers that they agree

15  with our construction.

16          And again, another important canon of claim

17  construction is you've got to think about what's being

18  described as the invention.  The invention is sort of

19  magic language.  That's acute to a person reading the

20  patent, how do I figure out the bounds of this thing.

21  If it says not an example but the invention is blank,

22  then that's critical and important to sort of

23  understanding the scope of the term.  And here, again,

24  the invention is a single metal multifunction part.

25          And the patent also says that the invention is

1    explained with reference to the figures, which may be

2    interpreted as saying that the figures are limiting

3    because they are being described as the invention.

4              THE COURT:  Do you agree that the '301 patent

5    discloses a single embodiment of the invention?

6              MR. KAVIAR:  I would say that, I would say

7    there are multiple embodiments based on the fact that

8    there's a disclosure here that it can be produced in

9    various ways, but each of those ways is consistent with

10   sort of the same concept here.  It wasn't clear to me

11   looking at the figures whether that was stamped or cast,

12   but in any event, there are multiple embodiments all

13   done the same exact way into a one-piece frame.

14             And again, I get to that point actually in the

15   next slide.  You read my mind, your Honor.

16             So, to go back over the file history.

17   Original claim one required the multifunction metal part

18   as asserted in claim one.  But claim four was actually

19   not the same as written.  So I disagree with my brother.

20   The only thing -- it wasn't as if they just combined one

21   and four.  They actually amended language to make it

22   more narrow before they combined claims one and four.

23             THE COURT:  It's not a very well drafted

24   patent.

25             MR. KAVIAR:  I would agree, your Honor.

1          THE COURT:  I've seen a lot better than this.

2    This is not well done.

3          MR. KAVIAR:  I would agree, your Honor, and

4    not to fault anyone but what I would speculate is that

5    this all came off of an Austrian provisional and whoever

6    prosecuting it got a pretty poor translation and didn't

7    force their translator to be a little more clearer.

8    That's what I presume happened.

9          So, when we're in the patent office, the

10   patent examiner says, hey, this '301 looks a whole heck

11   of a lot like <u>Schmitter</u>.  It has the same type of frame

12   setup.  It's got a barrel that connects into it.  And

13   Steyr did something -- so they rejected the claims as

14   anticipated by <u>Schmitter</u>.  And the examiner also wanted

15   to know what this means for locking.  What portion of

16   the multifunction part is intended to correspond to the

17   claim.  And again, I think if you look at the file

18   history it's clear at the time of examination even the

19   means for locking here before control means was added,

20   I'm talking about a portion of the actual MMP is part of

21   that piece.

22         So, these are the elements that the examiner

23   found were invalidating.  They pointed to 70 here, the

24   sort of side frames, and then this little connector part

25   as a means for locking 130.  It's in the red.

1          Now, as you can see, what's the difference

2    between the '301 patent and Schmitter.  Well, the only

3    real difference you can see from that in relevant part

4    is that the '301 patent is one single piece and the

5    control means here is a part of that one single piece,

6    and in Schmitter they are separate components.

7          Now, in response Steyr demanded an interview

8    with the examiner.  Now, this is a particularly tricky

9    sort of sophisticated thing to do.  What you're doing

10   there, instead of writing out in very clear and

11   exquisite detail what your arguments are so that they

12   can be preserved forever, you're having an interview

13   where you only get these notes that follow the

14   interview.  So, in the notes that follow the interview,

15   which are traditionally very short, the notes say that

16   Steyr mentioned as a distinguishing point, Steyr is

17   talking about item 70 and 130 in combination with

18   Schmitter.

19         Now, before I get to why that is actually a

20   disclaimer I just want to get to a couple sort of policy

21   points.  The doctrine of prosecution history disclaimer

22   is designed to protect the public and encourage

23   invention.  People are encouraged by patent law to

24   design around patents and come up with new and even

25   improved upon patents.  And the public is entitled to

1   look back and rely upon inventors' representations about

2   the scope of their invention.  And this supports the two

3   policies I just mentioned.

4          So, as we just discussed, the only material

5   difference here between Schmitter and the MMP is that

6   Schmitter's multiple components.  And my brother has not

7   put forward another reason why this patent got out of

8   the patent office in view of Schmitter other than the

9   fact that we're talking about a one-piece component, the

10  MMP.  And again, there are some images.

11         So, something about ambiguous when it is the

12  only reasonable conclusion that you can draw from the

13  information before you, and I would propose, your Honor,

14  that when you look at the interview summary, the only

15  reasonable conclusion that you can come to is that they

16  got around Schmitter by representing to the patent

17  office that their piece was a single one-piece part.

18         Now, my brother talked a little bit about the

19  standards.  For something to be a binding disclaimer, it

20  has to be clear and unmistakable.  It doesn't need to go

21  to the heart of patentability.  It can be a general

22  statement about the claim of scope.  But it has to be

23  clear that they're talking about the scope of the claim.

24         But what happens if something doesn't qualify

25  for a prosecution disclaimer or what if something

1   doesn't qualify as a prosecution estoppel or narrowing

2   amendment under some stuff that we'll get to in a

3   moment, what happens.  Well, what happens before the

4   patent office is still pretty darned important, and

5   according to Phillips and a lot of other Federal Circuit

6   cases you still look to it.  Maybe you don't say this is

7   the end statement, but even if you don't think it's a

8   clear and unmistakable statement, it's still relied upon

9   to determine the meaning of the term.

10          Now, just to get to Steyr's construction for a

11  moment.  As a starting point, it's 64 words long and

12  then it really merely copies or summarizes the other

13  terms in claim one.  So, if you adopted this proposal it

14  will confuse a jury.  The jury couldn't insert that into

15  the sort of sentence to figure out what it is.  A

16  definition is supposed to make things clear.  And if you

17  adopt this proposal, your Honor, it also will render

18  basic quality of all of the other terms redundant.  It

19  uses almost every single other limitation.  And I

20  believe you will ask my brother on rebuttal, but we

21  believe they're still trying to cover a multipiece MMP

22  with a control means that's separable.

23          I'm going to turn to control means unless your

24  Honor has any other questions for me at the moment on

25  MMP.

1              THE COURT:  So, your position is essentially

2     the MMP is a single one-piece part made of metal

3     performing more than one function.  That once it's been

4     formed or milled or cast, welded or stamped or otherwise

5     constructed cannot be separated into component parts

6     without destroying the integrity.

7              MR. KAVIAR:  You have my argument, your Honor.

8              THE COURT:  All right.

9              MR. KAVIAR:  So now turning to the control

10    means limitation.

11             So, as my brother introduced, this is a

12    means-plus-function limitation.  They work a little bit

13    differently.  You have to construe two different

14    portions.  You have to construe the means that's claimed

15    here, the term control means presumptively gives you the

16    rebuttable presumption as mean-plus-function, but we're

17    in agreement.  And when we look at the means, we're

18    supposed to only look at what's expressly disclosed in

19    the specification as the means to perform the function.

20    And we'll get to it in a moment, but there was a very

21    clear identification that happened during prosecution

22    history of what it is, and it's that bridge-like

23    portion, second bridge of the MMP, and it's designed to

24    engage a portion of the barrel.

25             Now the function here, locking said barrel in

1    the barrel slide, we believe that's indefinite.  We'll

2    get to it in a moment.  I think it's in part due to, as

3    your Honor mentioned, the patent not being particularly

4    clearly drafted, but it's unclear what function's

5    actually being claimed.  The function that my brother

6    just mentioned is nowhere described in the

7    specification, never showed up in the prosecution

8    histories.  It's just sort of out of figure out and out

9    of their imagination in our view respectfully.  Again,

10   we'll get to Steyr's proposal and some issues with it in

11   a moment.

12          So, to rewind in that initial office action,

13   the patent office said to Steyr, can you please confirm

14   what portion of the MMP is this claimed means for

15   locking.  And so they responded.  They responded by

16   amending the claim.  They added the language control.

17   So it's not just the combined claims one and four.  They

18   amended to be very specific.  And then they represented

19   very precisely that the pistol as claimed in claim one

20   wherein the multifunction metal part includes control

21   means, is actually referring to page seven, lines one

22   and two, of the specification by reference to numerable

23   33.  So, they're saying that it's a very specific

24   portion of specification.  Page seven, lines one and

25   two.  And that's precisely the control means we've been

1    looking at in the images.  That's the bridge, the second

2    bridge.

3            So now we've covered these first two issues.

4    The terms of identifying the function, use ordinary

5    principles of claim construction to construe and figure

6    out what the function is.

7            THE COURT:  Isn't it locking the barrel into

8    the barrel slide?  Is that what --

9            MR. KAVIAR:  Yes, I'm sorry.  This is the

10   specific language that they identified.  This is the

11   portion of the patent that they identified.

12           THE COURT:  Isn't that the function?

13           MR. KAVIAR:  Correct.  But what does that

14   mean, and we'll get to it in a moment.

15           Okay, your Honor, I can turn to that first,

16   but I was just going to get to a few things about what

17   structures are equivalent first to the control means.

18           So, we already know that the control means

19   cannot be removable because it's part of the MMP, right.

20   So we're not starting from scratch and we're trying to

21   figure out what's equivalent to control means.  We know

22   it has to be a part of the MMP.  And that's supported by

23   interview summary.  And again, when you're dealing with

24   this control means term, there's another thing that

25   applies.  Here -- and we have a disagreement with my

1   brother,as to whether there was a narrowing amendment

2   under _Festo_.  They believe _Festo_ does not apply.

3   Directing you to this Federal Circuit case that applies

4   _Festo_ means-plus-function claims, they are citing

5   district courts that I don't believe frequently practice

6   patent law and no circuit law on that point I believe.

7           But regardless, here if it's not a narrowing

8   amendment as they spoke about a little while ago, it

9   would still be persuasive evidence, and you look to it

10  to try to figure out the meaning of the term control

11  means.

12          THE COURT:  Well the _Beretta_ court didn't

13  credit your theory that the disclaimer language

14  overcame, did it?

15          MR. KAVIAR:  No, your Honor, but again, we

16  disagree with a lot of the opinion from the Alabama

17  court and respectfully we don't believe that the Alabama

18  court got the law right and was not provided all of the

19  facts, so we're not surprised it came to that

20  conclusion, but we think that's a function of the

21  briefing in that case, not the, not that it's correct.

22          So under Festo there's a four-part -- but,

23  your Honor, even if that's correct, even if it's correct

24  that there wasn't a quote, unquote, narrowing amendment

25  under the meaning of _Festo_, you would still look to what

1   happened to figure out what's the meaning of the term.

2   You just wouldn't give it sort of permanent weight.  It

3   would just be weighed against all the other

4   considerations.

5           So, if _Festo_ applies, which is our position,

6   we have to only show there's a narrowing amendment, and

7   then estoppel attaches unless they come back and prove a

8   number of different exceptions.  It's all in the

9   briefing so I won't get into it in the interest of time.

10          So was there a narrowing amendment.  They went

11  from means as a general principle to control means as

12  specifically described in two sentences in the patent.

13  We think that is per se narrowing.  The examiner

14  confirmed that the patent would only issue if Steyr

15  further combined original claims one and four.  By

16  combining four to one, it drastically narrowed the scope

17  of claim one.  And Steyr obtained the patent containing

18  only one claim subject to these changes.

19          And again, you know, in just thinking about

20  not from the perspective of the MMP but from the

21  perspective of the control means term, what's the

22  difference between control means in _Schmitter_ and the

23  that control means described in the '301 patent.  The

24  only difference is that it's a separable component.  And

25  that's the only conclusion you can draw.  And they have

1   not offered a competing explanation to my knowledge

2   though my brother can correct me on rebuttal.

3            So Steyr surrendered at least separable

4   control means.  Because if you want to figure out the

5   scope of the narrowing amendment, you disclaim quite a

6   lot when you make a narrowing amendment under <u>Festo</u>.

7   But trying to figure that out can complicate it.  Here

8   we know what it at least includes.  It at least

9   concludes stuff like the things in <u>Schmitter</u>, separable

10  components, separable control means.

11           Now, basically around the same time that they

12  filed the U.S. application off of the Austrian

13  provisional, they also filed a German patent

14  application.  And it matured into a German patent.  We

15  obtained an English translation of that patent, and I

16  think it was the first time that any court has seen that

17  translation.  It was not before the Alabama court.

18           The '301 patent and the German patent are very

19  close in almost every way.  They contain the exact same

20  figures, substantially the same specification, and the

21  claims were substantially the same at certain points.

22  There were some amendments and things of that, but

23  they're substantially the same claims.  They're talking

24  about same exact concepts.

25           So German patent claim three includes the

1    following:  A handgun according to claim one with a

2    barrel which is lockable in the slide, characterized in

3    that the locking control means are formed on the

4    multifunction metal part.

5              Now there's two interesting things going on

6    here, your Honor.  First it's using the same term,

7    control means, in Germany.  So we're talking about the

8    same thing.  This isn't sort of like a legal argument or

9    some legal part of the analysis.  The case law -- and my

10   brother said that there wasn't a lot of it, there is a

11   lot of it.  When you make a binding statement, when you

12   make a statement in a foreign court about a related

13   patent that's factual in nature as to the scope of a

14   related invention, it's an admission.  And we're talking

15   here about the control means and what's in the control

16   means.  Now, another thing that's interesting, it's

17   actually probably more clear from the German patent's

18   translation of this claim than it is from our patent,

19   that here they're talking about the control means as

20   this thing that locks the barrel in the slide, and it

21   seems to suggest that it's from the firing position

22   better in my view, but that's sort of an aside.

23             So, again, in the German patent the reference

24   to the control means is the, it's the same language,

25   it's the second bridge, and it represents a control

1  means for locking the barrel, and it references the same

2  pictures as the '301 patent.  And here's the '301 patent

3  language.  As you can see it's virtually identical.

4       Now during an opposition proceeding, a Sig

5  Sauer foreign affiliate contended that that claim three

6  with the control means limitation was invalid in view of

7  this very interesting Kel-Tec reference we've all been

8  discussing today.  Now, as noted in Kel-Tec, like

9  Schmitter, what's the main difference between the sort

10  of control means in Schmitter and the control means in

11  Kel-Tec and the control means in the '301 patent.  The

12  prior art have a separable component that serves as the

13  control means.  Here it's 110.  It's called out in red.

14  It's this pin right here.

15       So, in response to the argument that claim

16  three was invalid in view of Kel-Tec, Steyr responded

17  with a factual representation that the removal of the

18  pin in the Kel-Tec P11 is not a control means even

19  though it's being used to control the locking barrel

20  during the movement of the slide.  And it further

21  represented, again, this is factual, it's not a legal

22  argument, that it is not a control means because it is a

23  the permanent part of the multifunction metal part.

24  Rather, it is similar to a disassembly lever shaft.  And

25  again, that's a very specific type of shaft, we'll get

1    to it in a moment, but they're making the argument that

2    the Kel-Tec P11 doesn't really have a control means as

3    claimed because it's not a permanent part.  And the full

4    translation, everything is available at these cites, and

5    it's also on the right side of the slide.

6         So under the law, I just noted one, Gillette,

7    there's a bunch more in our brief and there's a bunch

8    more out there in terms of Federal Circuit law, these

9    are factual statements that operate as an admission that

10   the claim control means cannot be a removable pin like

11   the one contained in the Kel-Tec P11.  And it only makes

12   sense.  If you're representing to one foreign government

13   body that you're entitled to a -- and there are

14   treatises that apply to patent law as well.  So I want

15   to make sense.  If you're representing to a foreign

16   government that a control means factually did not

17   include X, that should travel with you to other

18   government bodies.  Including the U.S.

19        Now, the problems that we have with Steyr's

20   construction is, as a starting point, it leaves claim

21   construction of equivalents to the jury.  Now, I think

22   the argument here needs to be broken down into steps

23   because there's more going on than just you either let

24   the jury construe equivalents -- or excuse me, you

25   either let the jury determine what is an equivalent or

1    you don't.  So, as a starting point, and it's referenced

2    in every Penny, we have this case O2 Micro from the

3    Federal Circuit, it was a pretty big deal when it came

4    out, and in O2 Micro what the court said is this whole

5    claim construction process is about resolving the

6    disputes between the parties.  And the court, the role

7    of the court is to resolve those disputes.  And it needs

8    to resolve those disputes even if you're going to the

9    jury the day before, even, even if you're in the middle

10   of the trial, whenever they occur, because that's the

11   purpose of sort of the exercise of patent infringement

12   cases, that that's the kind of key critical role.

13        Now, also O2 Micro, this is a bit of an aside,

14   but also in O2 Micro you don't even need to assign a

15   construction.  A dispute might be as simple as something

16   like this is a means-plus-function claim or this isn't,

17   and even if the parties propose language, the court says

18   plain and ordinary meaning applies, it doesn't means it

19   does, either it says I don't think it's a

20   means-plus-function of plain and ordinary meaning.  So

21   the role isn't to actually necessarily provide words,

22   but it's to resolve the dispute.  And most of the time

23   resolving the dispute includes providing words.  And

24   they don't have to be word-for-word from either party

25   obviously, and they're supposed to resolve the dispute.

1          So here, even though at some point there could

2     be an equivalent argument that could be appropriate for

3     the jury, what we're saying is that everything that

4     happened in Germany and in the U.S. is a part of this

5     patent, and it's a part of the meaning of control means,

6     and so necessarily you can't recapture through

7     equivalents all of the stuff that you disclaimed to get

8     the patent.  So, what we're saying is that granted the

9     jury might be able to decide some equivalencies, they

10    can't decide the legal issue of whether the claimed

11    control means is a separable component.  That's a

12    question for the judge.  I think that's very clear on

13    the law.  And the main problem with Steyr's proposal,

14    even setting aside the number of words, is that it

15    actually doesn't directly address the dispute as to

16    whether a removable pin can constitute a control means.

17    And so, your Honor, if that was a question you're

18    inclined to ask my brother during rebuttal, we would

19    greatly appreciate it because we believe there's a

20    dispute there in that their construction doesn't address

21    it but they're trying to claim those removable pins.  We

22    also think that Steyr's construction ignores the file

23    history and the admissions from the related patent.

24    They keep saying they're not binding and they keep

25    saying, you know, maybe they continue get binding

1   weight.  Even given that as an assumption, we believe

2   obviously we do get binding weight.  But even if you

3   give them their argument, they're still entitled to

4   weight, they're still entitled to be considered, and

5   they only lead to the conclusion that the control means

6   is one piece.

7           Getting to locking the barrel in the barrel

8   slide.  So, the '301 patent references a control means

9   for locking the barrel in the specification, but it

10  doesn't explain how the control means can be used to

11  lock the barrel in the barrel slide.  The bridge that's

12  disclosed as the claimed control means is designed to

13  engage with the control attachments on the bottom of the

14  barrel's block after the gun is fired.  And this is an

15  image here of the video.  It's an annotation.  But this

16  is what it would look like if the gun was fired and the

17  control means is serving its job.  The control means is

18  preventing that barrel from moving further.  We're not

19  giving them that that's a locked position, but if you

20  presume that that's locking, you know, that's the only

21  thing that can be considered locking in the patent.

22          So the bridge could possibly, it might be

23  considered to lock the barrel to the MMP.  So the bridge

24  might lock the barrel to the frame, but it doesn't lock

25  the barrel in the barrel slide.  The slide as we saw,

1    and your Honor, if it would help I can go back to the

2    video, but the barrel slide keeps moving independent of

3    the barrel once it's fired, independent of the control

4    means.  And the barrel continues to travel backwards and

5    it's independent of the barrel slide.  Its movement is

6    not constricted by control means.  You cannot have a

7    control means directed to something that is not

8    controlling the movement of the other object.  It

9    logically doesn't make sense, and as a matter of patent

10   law doesn't make sense.  So, to us, the term locking

11   said barrel in the barrel slide is indefinite because

12   it's unclear what it actually means and what it

13   requires.  It's certainly not talking about the only

14   disclosed locking possibly that's going on in the

15   patent.  And I wasn't entirely clear with my brother's

16   argument, so I made a hidden slide.  I just need to pull

17   it up.  I thought he might be suggesting this.  I just

18   want to get to it.

19            THE COURT:  What we'll do is just take a

20   ten-minute break for the sake of our court reporter.

21            MR. KAVIAR:  Of course, your Honor.

22            (Recess taken.)

23            MR. KAVIAR:  Your Honor, may I continue?

24            THE COURT:  Yes.  You must be about done I

25   guess time wise.

1          MR. KAVIAR:  Yes.  I was informed that I might

2    have another minute or so.  That's all I will need if

3    that's okay, your Honor.

4          THE COURT:  Much of what you said seems to be

5    addressing the issue of equivalents and infringement,

6    and the Court isn't going to decide equivalents at this

7    stage or infringement.

8          MR. KAVIAR:  Respectfully I think we might be

9    on separate pages with respect to that point.  There are

10   events that happened during the prosecution that give

11   light to the meaning of a claim term.  There are things

12   in the specification that give light to the meaning of a

13   claim term.  Under <u>O2 Micro</u> and its subsequent cases,

14   that's all highly relevant to resolving a dispute

15   between the parties under <u>Phillips</u>.  It's highly

16   relevant.  You use that to determine the meaning of the

17   term.  Now it's very clear, and we can even do

18   supplemental briefing on this, you can't use

19   equivalents, whether it's means-plus-function

20   equivalents or, you know, equivalents under literal

21   infringement, you can't use the concept of equivalents

22   to recapture stuff that you've disclaimed.  So our

23   position is if you've disclaimed it or even if you

24   persuasively said that and that's something that isn't

25   given the disclaimer level weight but still is entitled

1   to weight, you can't go back and recapture it.  So

2   that's what we're saying, your Honor.  We would agree

3   that there are many questions of equivalence that we

4   would not ask the Court to address.  And with respect to

5   infringement, we're not asking the Court to address

6   infringement.  It just so happens to be that our product

7   operates quite similarly in relevant part to the

8   Kel-Tec, which is why we brought it up.

9         With respect to just the last point I'll make

10  about control means and with respect to the other

11  claims, we're just going to rest on the briefs.  There

12  are some slides in here that you're welcome to look at

13  that address the other terms, but we believe what we've

14  argued in the briefs.

15        My brother's argument is that locking  the

16  barrel in the barrel slide means that this piece and

17  this piece are working together to keep that barrel

18  sitting in that position when the gun is in the state

19  called breech.  There's a big problem with that theory.

20  When the patent office asked Steyr to define the means

21  at issue very specifically, they only pointed to one

22  thing.  They pointed to this thing.  So control means by

23  their own words is only that component and not others.

24        Now, if you look at this, we actually

25  highlighted all the parts that are the system that keeps

1    this barrel in this position in breech, so it's not just

2    this acting as a little ledge.  In fact, that's pretty

3    inconsequential.  And if you remove that ledge, it's

4    still going to stay in that position.  If you're talking

5    about keeping that still in that position, you've got

6    barrel slide on both sides with the divot.  You've got

7    this interface here and this interface here.  So all of

8    that's working together.  So the claim control means,

9    you can't cover all of that.  And if this item here is

10   not independently sufficient to exert the control, it's

11   not the control means for keeping it in that position.

12   It at most is a shelf in the control system or, I don't

13   know how you'd explain it, but that's an important

14   point.  And your Honor, this argument --

15          THE COURT:  Well, surely it's not a useless

16   part.

17          MR. KAVIAR:  No, it's not, but it's not

18   independently sufficient to keep that barrel in that

19   position.  It's working with many other parts.  And they

20   told the patent office the control means was only this

21   part and no other parts.

22          And also, your Honor, this idea of the gun in

23   this position being locked, it's not described anywhere

24   in the patent.  They're creating that argument at best

25   they can do with figure one, but there's no description

1   of that sort of configuration as being locked.  There's

2   no example of why that's locking.  They're just strictly

3   relying on this figure.  My brother can correct me if

4   I'm wrong, but I'm aware of no other passage that

5   supports that this is the claims locking.

6           Thank you for indulging me with a couple of

7   minutes.  We rest on the briefs with respect to the

8   remainder.

9           THE COURT:  Thank you.  Mr. Henneberger.

10          MR. HENNEBERGER:  Your Honor, so I'm going to

11  take some of these things out of order maybe but first

12  thing I want to talk about is this Festo case.  My firm

13  was counsel for Festo in that case.  That case was, I

14  was involved in that case more than 15 years.  That case

15  has nothing to do with literal equivalents under the

16  statute of a means-plus-function claim.  Irrespective of

17  that there's nothing in the prosecution history where we

18  made a clear disavowal of any claim scope.  That the

19  examiner raised an issue with what the means was, they

20  looked back, you look in the specification, if you look

21  at column two it says in the case of a pistol having a

22  barrel which can be locked in the barrel slide, the

23  invention achieves a further simplification in that the

24  control means for locking are formed on the

25  multifunction metal part.  So there's a passage there

1     that also discusses this locked in the barrel slide.

2     There was, I think there's some other -- there's another

3     place, there's something with a tilting -- it escapes me

4     right now.  But, you know, and they seem not to have any

5     problem understanding the control means when it comes to

6     the Kel-Tec pistol or any other pistol.  And you read

7     the specification as one of ordinary skill in the art.

8     So, a person of ordinary skill in the art is not going

9     to be you or me.  It's going to be somebody who's

10    familiar with these types of weapons, has background in

11    it, is maybe an engineer, has designed these sorts of

12    things, so they would understand what that is.

13           And the examiner is also a person of ordinary

14    skill in the art because he deals with these things on a

15    regular basis.  Examiners are assigned to particular art

16    units and they deal with a particular group of patents.

17    So the examiner who dealt with this pistol is in the

18    firearms group and would be looking at all sorts of

19    patents related to that.  So, he didn't seem to have an

20    issue with indefiniteness.  He allowed the case.  I

21    think it's clear and understandable to those of ordinary

22    skill in the art and that's how we're supposed to look

23    at the claims.

24           This other thing, the foreign prosecution.  So

25    here is the paragraph at issue.  And what Sig Sauer is

1   saying is that this sentence here, it says the
2   petitioner however neglects with regard to the assembly
3   pin 110, it is precisely the disassembly lever shaft
4   according to the invention which is not part of the
5   multifunction part but merely serves to assemble it that
6   is concerned.  So, what they're saying if I can go back
7   to -- what that sentence is saying is that in Kel-Tec
8   this pink assembly pin, it corresponds to the
9   disassembly lever shaft in the '301 patent.  So that's
10  the thing that assembles the barrel and barrel slide on
11  to the frame.  It doesn't hold the chassis on to the
12  plastic housing.  In order to do that Kel-Tec needs
13  these three pins.  So it's not a simple connection
14  between the multifunction metal part and the plastic
15  housing which is the invention.
16          Now Sig Sauer also -- and that pin gets
17  inserted after everything, after the multifunction metal
18  part is assembled into a unit and then inserted into the
19  housing.  Then these three pins go in.  And then when
20  you assemble the barrel and the barrel slide on, that's
21  only when the disassembly lever shaft or this assembly
22  pin goes in, and that's what that passage was about.
23  They're saying, well, that pin, that assembly pin
24  relates to the disassembly lever shaft.  And if you look
25  at our patent, the disassembly lever shaft is not part

1    of the multifunction metal part.  That's what the

2    passage says.  I don't understand how they can --

3    they're contorting it to something that it's not, that

4    somehow says that we say that it can't be a removable

5    pin.  That's not what the sentence says.

6              So, even if -- and again, it is extrinsic

7    evidence.  The laws are different.  The claim was

8    different.  And I'm pretty sure that the cases that

9    we've cited on that are on point and it is what it is.

10   But, so even if it is considered, I don't think it says

11   what Sig Sauer thinks that it says or is asserting what

12   it says.

13             And if we can go back to -- so if we look at,

14   this is the P320 of the accused products.  This blue pin

15   or control means is provided on to, is put into the

16   multifunction metal part before it's inserted into the

17   housing.  So they're trying to get a narrow claim

18   interpretation that says, well, the multifunction metal

19   part has to be a one-piece thing, and by us making this

20   a removable pin therefore we get out of infringement.

21   If your Honor decides that the multifunction metal part

22   is a one-piece as opposed to what I'm saying is single,

23   not necessarily a bunch of smaller component parts,

24   that's still a question of, under the statute, of

25   whether it's a literal equivalent to an integral -- to

1    an integral multifunction metal part, a one-piece

2    multifunction metal part.  It's not disclaimed, you

3    know, that would be an issue that if construe it in such

4    a way, we still believe that's still an infringement

5    because it is a literal equivalent under the statute.

6    Not a doctrine of equivalence, Festo equivalent, but a

7    literal equivalent pursuant to the statute.

8              I'm trying to think of what else I wanted to

9    -- were there any other issues that your Honor would

10   like me to address?

11             THE COURT:  No, that's fine, thank you.

12             MR. HENNEBERGER:  Okay, I don't think I have

13   anything else.

14             MR. KAVIAR:  Your Honor, may I proceed?

15             THE COURT:  Yes.

16             MR. KAVIAR:  To start in no particular order,

17   my brother keeps suggesting that the Court is not

18   empowered to construe the claims and rather a person of

19   skill, some expert should be coming in providing

20   evidence.  Two problems with that.  That violates

21   Phillips and a long line of Federal Circuit law.  The

22   Court is empowered to construe the claims and assign

23   meaning in view of the specification, file history, et

24   cetera.  If the parties believe that extrinsic evidence

25   in the form of expert testimony is relevant to this

1    process, they are empowered to bring it forward should

2    they want to.  They have not.  So every time my brother

3    references the need or we shouldn't look at this because

4    we need an expert to do it, not the Court, all of that

5    is irrelevant because they didn't bring that testimony

6    forward.  And piggybacking on that point, they keep

7    pretending as if the examination process was perfect and

8    was done by a person of skill that's known.  They have

9    introduced no evidence to suggest the examiner was a

10   person of skill.  We're well aware that the patent

11   office has been a flood system for a long period of time

12   and junk patents get issued and there are problems.  We

13   have the post patent review proceedings because of it,

14   we have tons of law review articles on the issue of the

15   problems with the patent system, and as you'll note,

16   this patent wasn't subject to a real strenuous look.  It

17   had an interview summary, a couple office actions.  I

18   would argue, your Honor, that just because it issued

19   from the patent office doesn't mean that these things

20   all make sense.  And in fact, that argument is also

21   logical because we have the ability to challenge in

22   court whether something is valid, whether something is

23   indefinite, all of these things because it's an

24   imperfect system.  So, I would not give weight to this

25   notion that the examiner understood everything perfectly

1     and it came out perfect because of it.

2             The next thing is, you know, in looking in the

3     foreign file history, we've given it to you, the Court's

4     entitled to look at it and make up its own mind.  My

5     brother I believe is misunderstanding what happened

6     because he keeps conflating all of the arguments.  And

7     he's also not acknowledging a very clear statement.

8     What we're saying is that Steyr told the German patent

9     office that the assembly pin is not a part of the

10    multifunction metal part.  And if I could have the table

11    where we're saying that.  We're saying that based on

12    this statement made by Steyr, the assembly pin is not

13    part of the multifunction part.  We're not putting words

14    in their mouth.  This is their admission.  Now granted

15    there was a big fight in various foreign patent offices

16    over the importance of this lever shaft.  It's a

17    separate limitation.  The multifunction part in the

18    patent itself isn't the lever shaft.  A lever shaft is a

19    very specific type of shaft.  They tried initially in

20    Europe I believe to get just the term shaft like they

21    did in the U.S. to get broader coverage, and they had to

22    reduce, they had to put this disassembly lever shaft and

23    they had to admit, this is in our other briefing, they

24    had to admit that's a very specific thing.  So, this is

25    a separate argument.  The stuff you see in the Kel-Tec

1    invalidity stuff, this is a separate issue.  This is

2    very plain statement as to whether the assembly pin is

3    part of the multifunction part, and they're saying it's

4    not.  So, that's an admission and that's the type of

5    thing you'll leave that to the jury.  This is precisely

6    the work that we believe the Court is empowered to do

7    based on Phillips and O2 Micro and Apple and Gillette

8    and other cases we cite that are specific to the

9    admission point and the more general ones I mentioned a

10   moment ago.

11            I don't believe my brother put forward any

12   support for its position that the claimed locking is the

13   way that the barrel's positioned in figure one.  I don't

14   believe those passages are supported.  You can look back

15   over the transcript.  I believe all he's showing is

16   figure one and saying someone looking at this would have

17   said this is the locking.  What is described as the

18   locking is the fact that there are control attachments

19   that engage with the multifunction metal part.  What is

20   disclosed is potential locking is locking the barrel to

21   the frame, but that's not locking the barrel in the

22   barrel slide because as the Court's aware from the

23   video, which I can bring back up -- so as you can see

24   from the animation in the video, what we're dealing with

25   at most is a barrel locking to the MMP.  The barrel

1    slide continues to move independent of the barrel.  So

2    the only quote, unquote, potential locking that's being

3    described is not what's being claimed.

4            In any event, your Honor, unless you have

5    further questions, I've addressed the points I wished

6    to.

7            THE COURT:  All right, that's fine.

8            MR. KAVIAR:  Thank you, your Honor.

9            THE COURT:  All right.  Well, thank you very

10   much for your presentations and the Court will take the

11   matter under advisement.

12            (Hearing concluded at 11:55 a.m.)

13

14

15

16            C E R T I F I C A T E

17

18            I, Sandra L. Bailey, do hereby certify that

19   the foregoing transcript is a true and accurate

20   transcription of the within proceedings, to the best of

21   my knowledge, skill, ability and belief.

22

23

24   Submitted: 1/8/2019

25

SANDRA L. BAILEY, LCR, CM, CRR
LICENSED COURT REPORTER, NO. 15
STATE OF NEW HAMPSHIRE